**David HILLER, a Handicapped child by his Parents and Natural Guardians Robert HILLER and Nancy Hiller, Plaintiff**

v.

**BOARD OF EDUCATION OF the BRUNSWICK CENTRAL SCHOOL DISTRICT, Defendant.**

No. 87–CV–1141.

United States District Court, N.D. New York.

Aug. 2, 1990.

Cooper Erving Savage Nolan & Heller, Albany, N.Y., for plaintiff; Robert G. Wakeman, of counsel.

Whiteman Osterman & Hanna, Albany, N.Y., for defendant Bd. of Educ. of Brunswick School Dist.; Melvin H. Osterman, Kenneth S. Ritzenberg, Jonathan Wood, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., Albany, N.Y., for defendant Thomas Sobol; Lawrence L. Doolittle, Asst. Atty. Gen., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

Plaintiff David Hiller ("David"), by his parents Robert Hiller ("Mr. Hiller") and Nancy Hiller ("Mrs. Hiller"), brings this action pursuant to the Education for All Handicapped Children Act ("EAHCA" or "Act"), 20 U.S.C. § 1400 *et seq.*, alleging that plaintiff is a handicapped child who was denied a free, appropriate education while a student at the defendant Brunswick Central School District ("Brunswick" or "Brittonkill"). Plaintiff seeks a declaration from this court stating that he is a handicapped child within the meaning of the Act; as well as $15,228.00 plus interest in monetary relief, which amount includes a demand for $10,000 in punitive damages against the defendant. Brunswick claims that David has never been a child with a handicapping condition, and that even had he been so handicapped, the education plaintiff received, and the services the defendant provided David during his attendance at Brunswick comported with the requirements of the EAHCA. For the reasons stated below, this court finds that (1) David was not a child with a handicapping condition during the 1985–86 or 1987–1988 school years, and (2) the education and services provided by the defendant to the plaintiff during the academic year 1986–1987 satisfied the requirements of the EAHCA. This matter was tried to the court without a jury from February 28, 1990 to March 6, 1990. Pursuant to Rule 52, Fed.R.Civ.P. the court makes the following:

### Findings of Fact

David entered the defendant's school system as a fifth grade student in September of 1985 after he and his parents moved from Albany, New York into the Brunswick school district. At the time of this transfer, Brunswick received academic and other records from David's prior school, records which gave no indication that the plaintiff ever suffered from any physical or learning disability or any handicapping condition.

Towards the end of September, David's fifth grade teacher, Hope Davis ("Davis") noticed that the plaintiff was experiencing problems with handwriting, organization, attention and following directions; therefore she arranged to meet with Mrs. Hiller to discuss Davis' concerns about the plaintiff. After this meeting, Davis referred the plaintiff to the school district's Child Study Team ("CST") in an attempt to ascertain the cause of plaintiff's learning problems.[1] At the time she filled out the CST referral form, Davis did not believe David had a learning disability, but, at the request of Mrs. Hiller, Davis asked the CST to determine whether the plaintiff was suffering from a learning disability, and if so

---

1. A CST is a group comprised of various professionals in the Brunswick school system whose purpose is to assist teachers in dealing with the problems that an individual student with a learning problem may be experiencing. Brunswick's CST is composed of the school's psychologist, the building principal, a speech and language therapist and a school nurse.

what remedial actions Brunswick should undertake.[2]

On October 9th, 11th, and 15th of 1985, the Chairperson of the CST Debra Marcal ("Marcal"), Brunswick's psychologist, with the consent of Mrs. Hiller, performed various tests on David which tested plaintiff's intelligence, achievement, and visual-motor integration skills.

On the Wechsler Intelligence Scales for Children—Revised ("WISC–R") test, David achieved a verbal score of 119, a performance score of 102, and a full scale IQ of 112. These test results indicated that David had high average functioning skills, above average verbal abilities, and average spacial abilities. Marcal testified at trial that David's IQ, based upon his WISC–R score, was high average. When given the Peabody Individual Achievement Test ("PIAT"), David performed at or above his current grade level in all areas but spelling, where he was functioning at a level one year below his fellow classmates.[3] His performance on the Visual Motor Integration Test ("VMI") was four years below his grade level, with his problems resulting from his weak attention span and difficulties in copying from the blackboard to his own paper.[4] David also successfully completed the test of written language ("TOWL"), which measures an individual's handwriting skills as well as their overall abilities to compose an essay. His handwriting appeared to be legible and was similar to that of an average seventh grader.[5]

At the conclusion of this battery of tests, Marcal noted that David:

[I]s a 5th grade boy of high average intelligence and average achievement in school. His performance of those skills that he possesses is sometimes hindered, however, by his poor attention spans and weak copying skills.[6]

While Marcal did not find David to be a learning disabled child, she did note that he had some learning problems which might be improved by modifications to his current classroom programs.[7] In response to Marcal's suggestions, David's fifth grade teacher implemented a remedial program for David designed to strengthen those areas in which plaintiff was academically weak.[8]

Approximately four months after Brittonkill's evaluation of David, Mrs. Hiller privately arranged to have her son evaluated by a team of professionals at the Boston Children's Hospital ("BCH"). After this evaluation, David's mother notified Brittonkill about the study and requested that she be given an opportunity, prior to receiving its written report, to orally inform Brunswick personnel about the results of the BCH study. The defendant granted Mrs. Hiller's request, and met with her on February 14, 1986. While at this meeting, Mrs. Hiller stated that she wanted David referred to the Committee on the Handicapped.[9] She also told those present that the persons at the BCH believed David should not do any writing in the classroom, but rather that all of his writing tasks should be performed on a word processor.[10] Relying on Mrs. Hiller's representations concerning the BCH's study, assertions which subsequently proved to be at variance with the actual written report, Bruns-

---

2. This referral form is reproduced in joint exhibit ("Jt.Ex.") A–1.

3. See Jt.Ex. A–2, p. 2.

4. Id., p. 3.

5. Id., p. 2.

6. See the "Summary and Recommendations" section of Marcal's report following these October tests, located in Jt.Ex. A–2.

7. Id.

8. At no time during the remainder of this semester did Mrs. Hiller claim that the tests performed on her son were inappropriate or inadequate, or that the modifications to David's classroom programs were failing to meet David's needs.

9. The Committee on the Handicapped has since been renamed, and will be referred to throughout this opinion as the Committee on Special Education ("CSE" or "Committee").

10. See minutes of the 2/14/86 meeting, Jt.Ex. A–18, pp. 2–3.

wick implemented several changes in David's educational program which included, *inter alia*, the use of a word processor for all of plaintiff's written work. However, after allowing David unrestricted access to this device for several weeks, Davis noticed that disciplining David had become more of a problem, and that the plaintiff's use of the word processor was causing a deterioration in his organizational skills and his ability to shift his focus from one subject to another while in the classroom; therefore Davis limited the time David could spend using the word processor while in school.

On March 10, 1986, Mrs. Hiller wrote to Darlene Egelson ("Egelson"), the chairperson of the CSE, and requested in writing that the CSE designate David as a child with a handicapping condition. In this letter, Mrs. Hiller also provided Brunswick with a copy of the BCH report. This study observed, *inter alia*, that Davis had noticed that the plaintiff had difficulty concentrating during class, was easily distracted and demonstrated impulsivity in his work style.[11] The report also noted that plaintiff's fine motor skills were compromised by his impulsive behavior and his disorganized approach to tasks.[12] The study offered numerous suggestions relating to David's academic program at Brunswick, and concluded that (i) David would benefit from approximately thirty minutes to one hour of remedial assistance daily, (ii) writing assignments should be highly structured for David, (iii) plaintiff would benefit from practice in advanced word attack skills and spelling drills, (iv) David should be encouraged to learn word processing, and (v) the use a typewriter or a word processor at home and in school would be a useful adjunct in developing his skills in written expression by reducing the effort required in the mechanics of the task.[13]

In response to Mrs. Hiller's request, Brittonkill notified the plaintiff's parents in writing that a CSE meeting would be held on April 8, 1986. At this meeting, the CSE heard presentations provided by plaintiff's mother, his teacher Hope Davis, and Brittonkill's psychologist Debra Marcal concerning David's condition.[14] The CSE also reviewed the findings of the BCH. Towards the end of this meeting, chairperson Egelson asked the members of the CSE if anyone present would recommend that David be classified as a child with a handicapping condition, however none of the members present so motioned. Realizing that the plaintiff nonetheless had special needs, Egelson emphasized to the members of the CSE that it was "incumbent upon [Brunswick] to make some other provisions for David", and accordingly arranged to have another meeting concerning the plaintiff's classroom programs on April 10, 1986.[15]

The chairperson of the CSE, the school principal, a speech pathologist, David's fifth grade teacher and Mrs. Hiller all met on this date to devise yet another remedial program for the remainder of David's fifth grade year. At the meeting, Mrs. Hiller conceded that her son had poor work habits that he would have to "unlearn" in order to be successful at school.[16] Brunswick explained to Mrs. Hiller the remedial program it had developed for the plaintiff, a plan which Mrs. Hiller conceded at trial met with her approval.[17] This program was implemented by the defendant, and David subsequently passed all of his fifth grade courses [18] as well as the statewide fifth grade writing test.[19]

---

11. *See* BCH report, Jt.Ex. A–46, p. 1.

12. *Id.*, p. 3.

13. *Id.*, p. 6.

14. The minutes of this 4/8/86 meeting are reproduced in Jt.Ex. A–21.

15. *See* minutes of the 4/8/86 meeting, pp. 4–5.

16. *See* minutes of the 4/10/86 meeting, Jt.Ex. A–22, p. 2.

17. The remedial program developed by Brunswick is reproduced in Jt.Ex. A–11.

18. David's fifth grade report card is reproduced in Jt.Ex. A–10.

19. *See* Jt.Ex. A–9.

On May 6, 1986, Mrs. Hiller met with the persons who were to become David's sixth grade teachers, and discussed with them the educational needs she believed David would have in the sixth grade. Approximately two weeks later, on May 19th, Sandy Surra, a speech pathologist for Brittonkill, re-administered the TOWL to David, at the request of the CST. His scores on this test were in the average range for all components of the exam except for that portion of the TOWL which tests an individual's writing abilities.[20] Surra therefore recommended that David's spelling and handwriting difficulties be monitored by Brittonkill, and that his progress in these areas be periodically re-checked.[21]

On June 19, 1986, David's parents once again privately arranged for an independent psychological evaluation of their son. In his report concerning David, Dr. Robert C. Williams ("Dr. Williams"), a licensed psychologist, recommended that (i) David be identified as a student with a learning disability known as dysgraphia, (ii) David's curriculum be adjusted to allow for the use of a word processor for written assignments, (iii) alternative testing procedures be devised by Brunswick for David, (iv) David be taught remedial cursive writing, if at all, "independently of other content", and (v) resource room help be provided for the plaintiff as needed.[22] As a result of Williams' report, on July 9, 1986, Mrs. Hiller's attorney, Robert G. Wakeman, wrote a letter to Egelson (as the CSE chairperson) requesting, among other items, an impartial hearing to challenge Brunswick's April 8, 1986 determination not to classify plaintiff as a handicapped child, and reimbursement of the costs of Dr. Williams' psychological evaluation of David.

Approximately one month after receiving this letter, representatives of Brittonkill met with David's mother and her attorney at an informal meeting on August 11, 1986. While there, the defendant, in an effort to avoid further conflict and in a futile attempt by it to avoid litigation, agreed to classify the plaintiff as a student with a handicapping condition. They agreed to hold a meeting of the CSE on September 9, 1986 wherein the Committee formally determined that David was a child with a learning disability,[23] and proceeded to formulate a Phase I Individualized Education Program ("IEP") for the plaintiff.[24] This IEP was memorialized in a writing, and provided accommodations for David in his regular classroom and for the use of a word processor for some of his written assignments at his teacher's discretion.[25] Brittonkill implemented this IEP as the plaintiff entered sixth grade at Brunswick.

On October 3, 1986, the plaintiff's attorney wrote to the CSE chairperson and re-

**20.** *See* Jt.Ex. A–12.

**21.** *Id.,* p. 2.

**22.** *See* psychological report prepared by Dr. Williams concerning David Hiller, 6/19/86, Jt.Ex. A–54, p. 5.

**23.** The parties are in disagreement over the reasons for Brittonkill's sudden reversal concerning its classification of David. The plaintiff claims that the defendant changed its position in light of Williams' study and the further testimony it heard concerning David's condition. The defendant maintains that it reversed the decision it had made only five months previously with respect to David as a way of placating the parents concerns and in an effort to avoid litigation. This court was more persuaded by the testimony of the defendant as it related to Brunswick's decision to classify David as a learning disabled child, and accordingly finds that Brittonkill classified David as a student with a handicapping condition only because it wished to avoid conflict with the plaintiff's parents, and not because it believed that David was actually handicapped. The hearing officer who reviewed this case prior to the instant proceeding similarly found this to be the true reason for defendant's classification of David. *See* the Findings of Fact and Decision of Hearing Officer Gordon S. Purrington, 11/7, 10–12/86 ("Hearing Officer Report"), p. 9.

**24.** The minutes of this 9/9/86 meeting of the CSE are reproduced in Jt.Ex. A–34. An IEP is a written plan developed (in New York) by a school district's CSE which specifies the special education programs and services to be provided by the school district in order to meet the unique educational needs of a handicapped child. *See* 20 U.S.C. § 1401(19), 8 N.Y.C.R.R. § 200.1(p).

**25.** This Phase I IEP is reproduced in Jt.Ex. A–35.

quested that Brunswick arrange for an impartial hearing whereby plaintiff's parents could determine both the appropriateness of the CSE's recommendations concerning David as well as the sufficiency of the Committee's data with respect to the plaintiff. This letter also requested reimbursement for the independent evaluations that had been conducted on David at the parents urging, and noted that David's parents wished to discuss the appropriateness of David's IEPs—including the appropriateness of the yet to be developed Phase II IEP.[26]

On October 8, 1986, David's resource room[27] teacher, Donna Fitzgibbons Langley ("Fitzgibbons Langley"), met with Mrs. Hiller to discuss the Phase II IEP Fitzgibbons Langley had tentatively prepared for use with David. This proposed IEP provided for writing and spelling remediation in the resource room, as well as remedial assistance to supplement plaintiff's regular academic classes. Mrs. Hiller objected to this Phase II IEP in that it addressed topics other than David's writing, spelling, and organizational skills. In an effort to appease David's mother, Brunswick revised its proposed Phase II IEP, and on October 23, 1986, at a meeting attended by Mrs. Hiller and her attorney, Brittonkill developed a Phase II IEP for the plaintiff which incorporated those changes requested by Mrs. Hiller.[28]

On November 7th, 10th, 11th, and 12th of 1986, hearing officer Gordon S. Purrington heard testimony presented by both parties concerning the education David was receiving at Brunswick. After reviewing all of the evidence before him, the hearing officer found, *inter alia*, that (i) Brittonkill reversed its earlier finding that David was not handicapped because it wished to avoid conflict and possible litigation, (ii) although Brittonkill's CSE failed to comply with most of the due process procedures con-

cerning "Notice" as required in the Commissioner of Education's ("the Commissioner's") regulations (8 N.Y.C.R.R. § 200.5(a)), such deficiencies were not prejudicial to the plaintiff in this particular instance, (iii) Brittonkill similarly failed to comply with the Commissioner's regulations when it failed to arrange for a CSE meeting within thirty days of Mrs. Hiller's request on February 14, 1986; however, as with Brittonkill's violations concerning the "Notice" requirements, these violations were nonprejudicial, (iv) the defendant had acted in good faith, responsibly, and timely in developing the Phase II IEP, (v) David did not have to use a word processor at all times, but that there was substantial evidence that its use may be required for extended writing tasks, (vi) plaintiff's parents were not entitled to reimbursement for either of the two independent evaluations they had arranged for their son, (vii) the Phase I IEP was appropriate for David, but that it lacked sufficient detail, and (viii) the Phase II IEP should be revised so as to integrate the courses David was being taught in the resource room with plaintiff's other classes.[29] The hearing officer then remanded the IEPs back to Brunswick's CSE noting that:

> Overall, I find that the Phase I and Phase II IEP to be appropriate in meeting the needs of this child except in the areas noted. I remand these matters to the Committee on Special Education and that such deficiencies be corrected within 30 days after respondent has received this document. The child will continue in his present program during that time.[30]

The CSE met on January 22, 1987 to develop a revised Phase I IEP in response to the hearing officer's directive. This tentative IEP provided for the use of a word processor:

> [T]o complete all book reports, all research reports for the Culture Fair, all

---

**26.** *See* letter from Robert G. Wakeman to Egelson, 10/3/86, Jt.Ex. A–38.

**27.** A resource room is a room whereby students at Brittonkill are given individualized instruction, outside of the student's regular classroom courses, in subjects where the student needs special assistance.

**28.** This Phase II IEP is reproduced in Jt.Ex. A–15.

**29.** *See* Hearing Officer Report, pp. 9–22.

**30.** *Id.,* p. 21.

Science World assignments & science research reports and all English compositions & projects. May copy Science notes over on a Word Processor; may also do any Science class assignments over again on a word processor. May do any homework on a word processor.[31]

Additionally, the IEP provided David with supplemental resource room assistance with Fitzgibbons Langley five times per week, and remedial assistance with Linda Macaione, a speech and language therapist, also for five times a week. Mrs. Hiller argued that David should not be taken out of his mainstream classes ten times per week, and that the portion of the proposed Phase I IEP which recommended the same was inappropriate. In yet another attempt to accede to the demands of plaintiff's mother, the CSE modified this tentative IEP and provided for supplemental assistance and remediation for David only eight times a week. Nevertheless, Mrs. Hiller refused to accept this modified Phase I IEP proposal, and Brunswick and the Hillers ultimately failed to reach an agreement concerning the provisions of plaintiff's new Phase I IEP. When the plaintiff's parents appealed the hearing officer's decision to the Commissioner of Education four days after this meeting, David's "then current" Phase I IEP remained in place.

On April 30, 1987, the Commissioner issued a ruling concerning the plaintiff wherein he *sua sponte* found that David was not a learning disabled child, and ordered Brunswick to annul its decision to label David as learning disabled.[32]

The following week, David was administered additional tests by the school's psychologist in order to ascertain whether David was in fact a child with a handicapping condition. Plaintiff's scores on these exams indicated that he was not learning disabled. For example, his results on the Stanford Binet Intelligence Scale indicated that the plaintiff possessed an IQ of 104, and that David fell within the average range for functioning skills; results comparable to the findings of the WISC–R performed on David approximately nineteen months previously.[33] Plaintiff's performance on the TOWL and the VIM tests demonstrated above average scores in the reading and math portions of the exams, and low average written language skills. David's relatively weak performance on this TOWL was explained by Marcal when she wrote, at the conclusion of David's psychological testing, that it was "important to mention [David's] haste in completing the TOWL. His effort on this instrument was notably less than on other measures administered by this examiner."[34] Marcal expanded on this comment when she testified at trial that David's low scores in the areas of thematic maturity, word usage, and style were attributable to the fact that he attempted to write (from memory) the same story on this administration of the TOWL that he had written for the TOWL he took in May of 1986.

In summarizing David's performance on these exams, Marcal noted in her psychological report of the plaintiff that:

> [W]hile David's written language and fine motor skills continue to fall below grade, they do show growth from his previous evaluation and his TOWL again falls into the average range of achievement compared to his agemates.[35]

On May 21, 1987, Brittonkill's CSE met and recommended that David not be eligible for special education services for the 1987–88 school year.[36] This decision was based upon the abovementioned psychological examinations performed on the plaintiff, as well as the testimony of David's

---

**31.** This proposed Phase I IEP is reproduced at defendants' exhibit "4".

**32.** This ruling was subsequently set aside by this court in *Hiller v. Bd. of Educ. of Brunswick Cent. Sch. D.*, 674 F.Supp. 73, 77 (N.D.N.Y.1987) ("*Hiller I*").

**33.** *See* plaintiff's exhibit N, p. 2.

**34.** *Id.*, p. 3.

**35.** *Id.*

**36.** *See* transcript of the 5/21/87 meeting of the CSE, plaintiff's exhibit K, p. 14.

sixth grade teachers.[37] At Mrs. Hiller's request, the CSE reconvened on June 11, 1987, and, based upon all of the information before it, clarified its May 21st determination and voted that David not be labeled as a child with a handicapping condition.[38] David went on to successfully complete all of his sixth grade courses at Brunswick.[39]

The defendant continued to implement the special education components contained in plaintiff's IEPs until January of 1988,[40] when Brittonkill was notified by Mrs. Hiller that David had been withdrawn from Brunswick and enrolled in the Christian Brother's Academy ("CBA"); a private, sectarian school which offers no specific services for handicapped children, offers no special education programs or services and is not on the Commissioner's approved list of private schools in which handicapped students may be placed.

Mrs. Hiller and Ernest J. Casile, Jr., a teacher and school administrator of the CBA, testified at trial that David has been doing well academically while a student at the CBA.[41] His academic improvement is partly attributable to the tutoring David is receiving after his classes at the CBA.

*Conclusions of Law*

(1) Which party bears the burden of proof in the instant proceeding.

The first issue this court must resolve concerns the allocation of the burden of proof in this district court proceeding. The plaintiff contends that Brunswick must prove the appropriateness of its classification, programs and placement of David while the defendant argues that the burden of proof is properly placed on the plaintiff in that he is the party seeking to overturn the decision of the state educational agen-

cy. Since the Second Circuit has not yet ruled directly on this issue, a review of other court's decisions in this area is instructive.

In *Lascari v. Board of Educ.*, 116 N.J. 30, 560 A.2d 1180 (1989), the Supreme Court of New Jersey concluded that:

[T]he obligation of the parents at the due process hearing should be merely to place in issue the appropriateness of the IEP. The school board should then bear the burden of proving that the IEP was appropriate.

*Id.*, 560 A.2d at 1188. The court reasoned that its holding was consistent with the intent of the statutory and regulatory schemes of the EAHCA, and that the burdens of persuasion and of production should be placed on the party better able to meet those burdens. *Id.*, 560 A.2d at 1188–89.

In *Grymes v. Madden*, 3 E.H.L.R. 552:183 (D.Del.1979), *aff'd. in mem.* 672 F.2d 321 (3rd Cir.1982), a child who was admittedly handicapped had received only a partial tuition reimbursement from the defendant school district and the Delaware State Board of Education for the education of their son, James, in a private school for learning disabled students during the pendency of their claim under the EAHCA. The parents of the child appealed this ruling to the district court, and sought full tuition reimbursement from the defendants.

The court held that since the defendants failed to prove to the hearing officer that the school district could provide James with an appropriate public education, they were required to pay the full cost of the tuition at the private school selected by James' parents.[42] In affirming the district court's ruling, the Third Circuit reasoned that:

---

**37.** *See id.*, pp. 1–9.

**38.** *See* minutes of the 6/11/87 meeting of the CSE, plaintiff's exhibit P.

**39.** *See* David's sixth grade report card, reproduced in plaintiff's exhibit AF.

**40.** Mrs. Hiller requested that David be taken out of the resource room program entirely because

she believed that he was not making any progress in this program. *See* transcript of the 5/21/87 meeting of the CSE, pp. 10–11.

**41.** David successfully completed his seventh grade courses at the CBA. *See* plaintiff's exhibit X.

**42.** The school district in *Grymes* attempted to prove for the first time at the district court

[T]he trial judge awarded the Grymeses an amount equal to full tuition because the local school district had failed to sustain its burden of proof that an appropriate public program existed.

*Grymes,* 672 F.2d at 322.

While at first glance this holding may appear to be placing the burden of proof on the school district in a district court proceeding, a review of the district court's reasoning in *Grymes* illustrates that its discussion focused on the burden of proof before a hearing officer, and not the burden of proof before a district court.[43]

Other courts considering this issue have clearly held that the burden of proof in a district court proceeding is on the party challenging the administrative determination. For example, in *Tracey T. v. McDaniel,* 610 F.Supp. 947 (D.C.Ga.1985), the parents of a handicapped child brought on a motion to determine which party was to bear the burden of proof in an action to overturn the finding and decision of the state educational agency which upheld an IEP developed by the agency and local school officials. After carefully reviewing the differing positions held by the parties, the court concluded that the child and her parents bore the burden of proof with respect to their EAHCA claims. *Id.,* 610 F.Supp. at 950.

In *Spielberg v. Henrico County Public Schools,* 853 F.2d 256 (4th Cir.1988), *cert. denied* — U.S. —, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989), the Fourth Circuit recently noted:

[The district court] assigned the burden of proof to the defendants as the party seeking to change [the handicapped child's] placement. *The burden, however, is more properly allocated to the party bringing the civil action to challenge the state administrative decision.* Although we reach the same result as the district court based on procedural noncompliance, *infra,* we cannot affirm its reasoning because of the misallocation of the burden of proof (citations omitted) (emphasis added).

*Spielberg* 853 F.2d at 258, n. 2.

Similarly, in *Kerkam v. McKenzie* 862 F.2d 884 (D.C.Cir.1988), the court, in placing the burden of proof in a district court proceeding on the party challenging the hearing officer's decision, found that:

Such an allocation of the burden accords with [*Hendrick Hudson Dist. Bd. of Ed. v.*] *Rowley's,* [458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ] requirement of deference to the state agencies that must follow the statutorily mandated procedures—in this case, the hearing officer (citations omitted).

*Kerkam* 862 F.2d at 887. *See also Anderson v. District of Columbia,* 877 F.2d 1018, 1019 (D.C.Cir.1989), *Bales v. Clarke,* 523 F.Supp. 1366, 1370 (E.D.Va. 1981).

▪ After due consideration, this court finds the reasoning in this latter group of cases more persuasive, and holds that the party challenging the findings of the administrative determination in a district court proceeding, (in the instant case the

proceeding that it had developed an adequate program for James, and that therefore the plaintiffs were not entitled to the relief requested. In rejecting its offer of proof in this regard, the district court found that the objective of Delaware's program of educating handicapped persons would be "frustrated if the [school] District were permitted to ignore its obligation altogether in the due process hearing and then attempt to justify its actions in court a year and a half later." *Id.* at 322.

**43.** The plaintiff cited numerous opinions from the Commissioner of Education in further support of his contention that the burden of proof in the instant proceeding should be on Brunswick. While these decisions stand for the prop-

osition that a school district has the burden of proving the appropriateness of its placement and programs concerning a handicapped child before both the hearing officer and the Commissioner, they never hold that the burden of proof in a district court proceeding is always on the school district. *See e.g. Matter of Alfred and Vicki S.,* 18 Ed.Dep't.Reporter 397, 399 (1979), *Matter of Handicapped Child* 26 Ed.Dep't.Reporter 156, 157 (1986), *Matter of Handicapped Child* 26 Ed.Dep't.Reporter 100, 102 (1986), *Matter of Handicapped Child* 23 Ed.Dep't.Reporter 329, 330 (1984), *Matter of Handicapped Child* 23 Ed.Dep't.Reporter 348, 349 (1984), *Matter of Handicapped Child* 19 Ed.Dep't.Reporter 516, 517 (1980), *Matter of Handicapped Child* 19 Ed. Dep't.Reporter 233, 234 (1979).

plaintiff,) must prove, by a preponderance of the evidence, that the administrative findings should be set aside.

**(2) The deference to be accorded to the hearing officer's findings of fact.**

The standard for evaluating claims brought under the EAHCA is set forth in 20 U.S.C. § 1415(e)(2). This section provides that parties who have exhausted their administrative remedies:

> [S]hall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph, the court shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

In interpreting this provision of the Act, the Supreme Court, in *Rowley, supra,* found that:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

*Id.,* 458 U.S. at 206, 102 S.Ct. at 3051, 73 L.Ed.2d 690.

In *Town of Burlington v. Mass. Dep't. of Educ.,* 736 F.2d 773 (1st Cir.1984), *aff'd. sub nom.* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the First Circuit emphasized that:

> The determination of what is "additional evidence" must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo.*

*Id.,* 736 F.2d at 791. The court continued by noting that:

> [I]n recognition of the expertise of the administrative agency, [the court] must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole. There is a corollary to this rule. Where a state administrative decision rules a proposed IEP invalid because it has not met the state's substantive or procedural requirements pertaining to a free appropriate public education for a particular disabled child, a federal court should accord the findings deference.

*Id.* at 792.

A number of other courts, including the Second Circuit, have held that the administrative findings in lawsuits brought under the EAHCA should be accorded some degree of deference. *See e.g. Briggs v. Board of Educ. of State of Conn.,* 882 F.2d 688, 693 (2d Cir.1989) ("[d]eference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped (*citing Rowley* )), *Burke County Bd. of Educ. v. Denton,* 895 F.2d 973, 981 (4th Cir.1990) (court has obligation to consider the administrative findings carefully and respond to the administrative resolution of the issues), *Anderson, supra,* 877 F.2d at 1025 (authority of the district court to receive new evidence does not transform the proceedings into a trial *de novo* ), *Bertolucci v. San Carlos Elementary School Dist.,* 721 F.Supp. 1150, 1154 (N.D.Cal.1989) (courts must give due weight to administrative proceedings in EAHCA cases).

In the instant proceeding, this court has carefully reviewed the findings of hearing officer Purrington, and has afforded those findings due weight in reaching its own

conclusions concerning the education and services provided by Brittonkill to David.[44]

(3) Procedural violations committed by Brunswick.

■ The plaintiff claims that David was denied an appropriate education because of numerous procedural violations allegedly committed by the defendant. For example, the plaintiff argues that Brittonkill violated 34 C.F.R. § 300.504(a) when it failed to notify David's parents of its decision not to refer David to the CSE in September of 1985. However, this regulation states that written notice must be given to the parents of a *handicapped child* before a decision is made by a public agency to refuse to, *inter alia*, evaluate the placement of a child. As stated *supra*, Brunswick had no reason to believe that David was handicapped in September, 1985. His fifth grade teacher believed David only had a learning *problem*. Davis asked the CST to determine if David may have had a learning disability not because she believed David was handicapped, but rather because Mrs. Hiller requested that Davis include this question on the CST

referral form. Since David had not been declared a handicapped child in the fall of 1985, Brunswick committed no procedural violations when it failed to notify the plaintiff's parents of its decision not to refer David to the CSE.[45]

Plaintiff also notes that Mrs. Hiller orally requested a meeting with the CSE on February 14, 1986, yet the meeting did not take place until April 8, 1986; thereby violating the provisions of 8 N.Y.C.R.R. § 200.4(c), which requires the CSE to make a recommendation concerning a child not previously identified as having a handicapping condition to the Board of Education within thirty (30) days of the receipt of the parent's consent to the evaluation.[46] After this April 8th meeting, the defendant did not prepare a written report of the results of the evaluation as is required by 34 C.F.R. § 300.543. Additionally, the plaintiff demonstrated, before the hearing officer and at trial, that on several occasions Brunswick failed to fully comply with various procedural requirements set forth in 8 N.Y.C.R.R. § 200.5(a). Plaintiff contends that these failures by Brunswick to meet

**44.** The plaintiff argued in his post-trial memorandum that the administrative findings should be accorded no deference in this proceeding. This contention is premised on the numerous procedural violations the defendant allegedly committed while David was a student at Brunswick. However, the hearing officer found that the procedural violations complained of were non-prejudicial, and, as discussed *infra*, the plaintiff likewise failed to prove at trial that any procedural violations committed by the defendant were prejudicial to the plaintiff or his parents. Therefore, this court finds that the administrative findings in this proceeding are entitled to the "due weight" discussed by the Supreme Court in *Rowley*.

**45.** New York regulations similarly did not require Brunswick to refer David to the CSE in the fall of 1985. 8 N.Y.C.R.R. § 200.4 provides that "[a] *pupil suspected of having a handicapping condition* shall be referred in writing to the chairperson of the district's committee on special education...." (emphasis added) Since the defendant believed David had a learning *problem*, but not a learning *disability*, there was no reason for it to refer David to the CSE. Plaintiff, relying on *Quackenbush v. Johnson City School District*, 716 F.2d 141 (2d Cir.1983) *cert. denied* 465 U.S. 1071, 104 S.Ct. 1426, 79 L.Ed.2d 750 (1984) and *New York City Bd. of Educ. v. Ambach* 88 A.D.2d 1075, 452 N.Y.S.2d

731 (3rd Dep't.1982), claims that David's parents should have been informed of all of their procedural rights once Brunswick referred David to its school psychologist. However, *Quackenbush* involved a claim where the defendant knew or should have known that the child was handicapped, therefore the child's parents had to be notified in writing of the CSE's actions pursuant to 8 N.Y.C.R.R. § 200.5(a)(1). The third department's holding in *Ambach* is equally distinguishable. There, the disabled child's mother asked the Committee on the Handicapped to evaluate her son for a possible handicapping condition. Despite the provisions of 8 N.Y.C.R.R. § 200.5(a)(1), the school district failed to notify the plaintiff's parents of its determination in writing, and committed other procedural violations after receiving the mother's request for an evaluation of her son.

In the instant case, neither the defendant nor Mrs. Hiller requested that David be referred to the CSE in the fall of 1985, because at that time he was only suspected of having a learning problem; thus procedural regulations concerning the parents of handicapped children were inapplicable at this time.

**46.** Brunswick claims that Mrs. Hiller never formally requested a meeting with the CSE until her letter dated March 10, 1986, which is reproduced at Jt.Ex. A–52.

the Act's procedural requirements are adequate grounds by themselves for holding the defendant liable in this action. This argument is not persuasive.

One of the primary purposes of the procedural requirements of the EAHCA is to ensure that parents remain actively involved in formulating the plans and policies developed by state and local agencies for handicapped children. *Rowley, supra,* 458 U.S. at 208, 102 S.Ct. at 3052. In support of his contention that the procedural violations committed by Brunswick deprived David of a free, appropriate education, plaintiff cites *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629 (4th Cir.1985), and *Board of Educ. of Cabell County v. Dienelt,* 843 F.2d 813 (4th Cir.1988). However, plaintiff's reliance on these cases is misplaced.

In *Hall,* it was uncontroverted that the defendant school district failed to notify the parents of James, a child suffering from dyslexia, of their procedural rights for a period of almost three years. Additionally, the defendant had misled the parents by suggesting that they hire a tutor for their handicapped child at their own expense, without informing them of the possibility of public funding for that tutor. Similarly, after the parents announced their intention to withdraw James from the public school, the school district failed to discuss with them the possibility of public funding for residential schooling. *Id.,* 774 F.2d at 634–35. The court noted:

> *Rowley* recognizes that parental participation is an important means of ensuring state compliance with the Act. Unless school systems apprise parents of their procedural protections, however, parental participation will rarely amount to anything more than parental acquiescence, because parents will presume they have no real say, and the participatory function envisioned by *Rowley* will go unfilled.

*Hall,* 774 F.2d at 634.

In *Dienelt, supra,* the district court ordered the Cabell County Board of Education to reimburse the Dienelts for the tuition and related expenses incurred by placing Paul, a learning disabled child, in a private school because the school district failed to adequately involve the Dienelts in the preparation of Paul's proposed IEP. The Fourth Circuit found that, as a result of the school district's procedural violations concerning Paul's educational program, "the [school] Board utterly failed to determine the special educational needs of Paul Dienelt or to provide him with an adequate IEP." *Id.,* 843 F.2d at 815.

■ Unlike the parents in *Hall* or *Dienelt,* David's parents actively participated in the development of plaintiff's educational program throughout his enrollment in the defendant school district. While Brunswick did, at times, violate the letter of the law concerning the procedures involved in developing and implementing educational programs for David, the plaintiff failed to prove that any of these violations prejudiced the plaintiff or his parents in any way. In fact, the proof at trial demonstrated to this court that the plaintiff's parents were thoroughly involved in the planning, formulating and execution of David's educational program while at Brittonkill, and that the defendant fully complied with the spirit of the EAHCA in its dealings with the plaintiff and his parents. In such cases, it is inappropriate to find that a handicapped child was denied a free and appropriate education solely on the basis of a school district's violations of the Act's procedural requirements. *See Max M. v. Illinois State Bd. of Educ.,* 629 F.Supp. 1504, 1517–18 (N.D.Ill.1986).

(4) David's status while a student in the Brittonkill School District.

Before determining whether David was a learning disabled child during his enrollment at Brunswick, it is important to review how that term is defined by both federal and state regulations.

■ In order to be classified as learning disabled under the EAHCA, a child must show a severe discrepancy between achievement and intellectual ability in one or more of the following areas: (i) Oral expression; (ii) Listening comprehension; (iii) Written expression; (iv) Basic reading

skill; (v) Reading comprehension; (vi) Mathematics calculation; or (vii) Mathematics reasoning. *See* 34 C.F.R. § 300.541(a), *Riley v. Ambach*, 668 F.2d 635, 637–38 (2d Cir.1981).

New York state has defined a learning disabled student as "[a] child who exhibits a discrepancy of 50 percent or more between expected achievement and actual achievement determined on an individual basis." *See* 8 N.Y.C.R.R. § 200.1(cc)(3).

While the federal "severe discrepancy" standard is not identical to the state "50 percent" standard, the Second Circuit has noted that "[t]he 50% standard may in practice prove to be no more restrictive than the severe discrepancy rule." *Riley, supra*, 668 F.2d at 641.

With these somewhat amorphous, yet similar standards in mind, this court must determine if David was a learning disabled child while a student at Brunswick, and if so, whether Brunswick complied with the requirements of the Act in the educational programs it developed for the plaintiff.

(a) *The 1985–86 academic year.*

▇ The plaintiff failed to prove that David was a handicapped child while in fifth grade at Brunswick during the 1985–86 school year. When he enrolled in Brittonkill, no one in the school district was informed that David was suffering from any physical or learning disability, or that he had any handicapping condition. When his teacher noticed that David was experiencing problems with his handwriting, organization and attention span, Davis referred the plaintiff to Brunswick's CST.

The school's psychologist performed various tests on David, tests which are typically used to determine if a child has a learning disability. The cognitive tests demonstrated that David's IQ was high average. The PIAT indicated that David was functioning at or above his current grade level in all areas but spelling. Additionally, his handwriting was legible and similar to that of an average seventh grader.[47]

Dr. Frank Vellutino, a clinical psychologist and expert witness for the defendant, reviewed David's performance on various psychological tests [48] and testified at trial that the plaintiff's above average score on the Wechsler Block Design subtest was inconsistent with a neurologically based learning disability.[49] He explained that a neurologically based handicap would have affected other aspects of plaintiff's life, including, *inter alia*, David's ability to walk and learn a language; yet there was no evidence that David ever experienced any of these problems. Dr. Vellutino attributed David's poor performance on some of the easier psychological tests to plaintiff's impulsivity, lack of attendance to detail and personal style. With respect to David's handwriting, Dr. Vellutino testified that he was "mystified" that people claimed David had a handwriting disability.[50]

After thoroughly evaluating all the evidence before it, this court finds that David was not a learning disabled child, as that term is defined by either federal or state guidelines, during the 1985–86 academic year. Therefore, Brunswick was under no obligation to refer David to the CSE at this time, and the remedial program developed

---

47. *See* Jt.Ex. A–2, pp. 1–2. David's fifth and sixth grade teachers testified at trial that other students in Brunswick had handwriting which was much worse than David's.

48. While Dr. Vellutino conceded that he had not examined David personally because he believed Mrs. Hiller would have refused such a request, (and that his opinion might have changed had he so examined David,) he testified at trial that he could determine whether David was handicapped without an individual examination by thoroughly analyzing the results of the psychological tests performed on David.

49. The average score on the Wechsler Block Design subtest is a 10; David scored a 12 on this portion of the exam. *See* Jt.Ex. A–2, p. 2.

50. Drs. Robert C. Williams and Anne Meyer both testified that David is learning disabled, however neither of these doctors explained to the satisfaction of this court how a learning disabled child could have performed so well on the October, 1985 psychological exams. On balance, this court found the testimony of Dr. Vellutino more credible than that of Drs. Williams and Meyer concerning whether David was a handicapped child during the 1985–86 school year.

by the defendant school district was both legally sufficient and appropriate for the academic needs of David.

(b) *The 1986–87 academic year.*

On September 9, 1986, in an attempt to avoid litigation with plaintiff's parents, Brunswick's CSE unanimously declared David a child with a learning disability, and developed and implemented Phase I and Phase II IEPs for the plaintiff. The Hillers appealed the CSE's determination to an impartial hearing officer, alleging that the IEPs did not provide David with an appropriate education. In particular, the Hillers claimed that the programs were deficient because David was not allowed to use a word processor at all times while in the classroom. The hearing officer found the IEPs appropriate in meeting the needs of David, but remanded them to the CSE for more specificity and detail, with the direction that Brunswick more fully integrate David's remedial program with his regular classroom courses. The Hillers subsequently appealed the hearing officer's findings to the Commissioner.[51]

In finding the Hillers not entitled to reimbursement for the two independent psychological examinations conducted by the BCH and Dr. Williams, the Commissioner held that the district's evaluations were "adequate to ascertain both the nature of the boy's academic problems and the appropriate measures to remedy that deficit." He then, *sua sponte*, reversed the CSE's finding that plaintiff was handicapped, and explained that while the evaluations and psychological tests performed on David indicated distinct problems in plaintiff's handwriting, the results did not reflect a severe discrepancy between actual and expected performance.

In *Hiller I*, this court held that the Commissioner exceeded the scope of his authority when he reversed the CSE's determination that David was handicapped, because none of the parties had raised that issue on appeal. This court also declared David a

handicapped child for the 1986–87 academic year. *Id.*, 674 F.Supp. at 77. Thus, at this stage in the proceeding, this court is bound by the CSE's determination that David was a learning disabled child during his sixth grade at Brunswick.[52]

Every New York school district must provide a resident handicapped child with a free and appropriate public education specifically designed to meet his needs by means of an IEP developed by the school district's Committee on Special Education. *See* 20 U.S.C. § 1400 *et seq.*, N.Y. Education Law § 4401 *et seq.*, 8 N.Y.C.R.R. Part 200.

A school district is not required to implement a program that will maximize the handicapped child's potential. *Rowley, supra*, 458 U.S. at 198–99, 102 S.Ct. at 3046–47. Rather, in examining the appropriateness of an educational program developed pursuant to the EAHCA, a court's inquiry is twofold:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures *reasonably calculated to enable the child to receive educational benefits?* If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more (footnotes omitted) (emphasis added).

*Id.*, 458 U.S. at 206–07, 102 S.Ct. at 3051.

In discussing the requirements of an IEP, the *Rowley* court held:

> [T]he IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, *should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade* (emphasis added).

*Id.*, 458 U.S. at 203–04, 102 S.Ct. at 3049.

---

51. David's eligibility under the EAHCA was not contested by either party on this appeal, or in the appeal before the hearing officer.

52. In its post-trial memorandum, the defendant noted that it does not challenge the 1986 classification of David as a handicapped child. *See* post-trial memorandum of defendant Board of Education, p. 41.

This court has already held that Brunswick sufficiently complied with the procedures set forth in the Act, therefore the only remaining inquiry is whether the IEPs developed by the defendant were reasonably calculated to enable David to receive educational benefits.

Plaintiff claims that the programs developed by Brunswick for David were inadequate because they allegedly failed to identify or address the major defects found in David's psychological testing, and deferred the use of the word processor to the discretion of his classroom teachers. Plaintiff further argues that the full time use of a word processor in the classroom is necessary to meet David's unique needs.

A school district's CSE, and not the handicapped child's parents or professionals hired by the parents, bears the ultimate responsibility for establishing an appropriate IEP; the CSE is not obligated to accept the recommendations of outside professionals or follow the preferences of the parents. *See e.g. Matter of Nancy B.*, 17 Ed Dep't.Rep. 42, 43–4 (1977), *Matter of Handicapped Child*, 23 Ed Dep't.Rep. 335, 336 (1984), *Matter of Handicapped Child*, 21 Ed Dep't.Rep. 544, 547 (1982), *Matter of Gerald H.*, 17 Ed Dep't.Rep. 419, 422 (1978); *Cothern v. Mallory*, 565 F.Supp. 701, 707–08 (W.D.Mo.1983) (IEP developed by school district not only appropriate for handicapped child but also superior to the program recommended by child's parents).

In the instant case, the Phase I IEP developed by Brunswick's CSE: (i) recognized that David had fine motor delays, (ii) noted that David was somewhat distractable and responded impulsively, (iii) provided for extended time limits for written tasks, (iv) allowed David the use of alternative test locations, (v) permitted the use of a word processor at his teacher's discretion, and (vi) provided David access to Brunswick's resource room five times per week to improve his organizational and expressive writing skills, as well as his capacity to transfer ideas into written form.[53]

The Phase II IEP implemented by Brunswick's CSE established as a goal for David increased skills in his mainstream classes with particular emphasis on improving his expressive writing abilities, organizational skills and ability to process thoughts and ideas in written form. The defendant, through various teaching methods and materials, sought to achieve these goals by strengthening David's (i) cursive handwriting skills, (ii) writing and vocabulary skills in social studies, science, and language arts, (iii) study skills, test-taking abilities and organizational skills, and (iv) basic composition skills and written expression. Brunswick monitored David's progress in these areas on either a daily or weekly basis.[54]

While the hearing officer found the Phase I IEP lacking in sufficient detail, and the Phase II IEP deficient in that it did not more fully integrate plaintiff's resource room activities with other areas in David's schooling, he concluded that both of these programs were otherwise appropriate in meeting the needs of David. This court concludes that the programs developed by Brunswick were appropriate for David's needs and satisfied the requirements of N.Y. Education Law § 4401 *et seq.*, 8 N.Y. C.R.R. Part 200 and the EAHCA.

An examination of David's progress from fifth to sixth grade demonstrates that these IEPS were reasonably calculated to enable David to receive educational benefits, achieve passing marks and advance from grade to grade.[55] As his report card

---

53. *See* Jt.Ex. A–35.

54. *See* Jt.Ex. A–15.

55. The following is a comparison of some of David's fifth and sixth grade marks:

| | Fifth Grade, Fourth Quarter Grades | Sixth Grade Final Averages |
|---|---|---|
| English: | C | 69 |

| | Fifth Grade, Fourth Quarter Grades | Sixth Grade Final Averages |
|---|---|---|
| Social Studies: | B— | 73 |
| Science: | C— | 69 |
| Mathematics: | D | 67 |
| Reading: | B— | 74 |

A letter grade of "U", or a numerical grade below 65 is failing in Brunswick.

indicates, David's relatively low final marks in sixth grade were attributable to the fact that David (i) did not always give his best effort, (ii) failed to complete his homework and/or classroom assignments, and (iii) often talked during some of his lessons with his classmates.[56] Ms. Joanne Gallagher, David's sixth grade Science teacher, testified at trial that the plaintiff was careless, easily distracted by other students and had poor organizational skills typical of a sixth grader. She also noted that his grades would have been better had David put more effort into his work and turned in all of his assignments. Similarly, David's sixth grade English teacher, Mr. Edward C. Peck, Jr., testified that plaintiff's final grade was lowered because David failed to turn in all of his homework assignments and had poor organizational skills. In sum, David clearly received educational benefits from the programs developed by Brunswick. His less than outstanding performance was due to a combination of his lack of effort, disorganization and failure to turn in all of his required assignments; it was not the result of allegedly inadequate educational programs devised by the defendant.

Even if, contrary to the findings of this court, the IEPs had been deficient in certain areas, the Hillers prevented the defendant from curing any defects in the programs. Brittonkill's CSE, in response to the hearing officer's remand, developed a revised Phase I IEP which noted that David: (i) had weak selective attention skills, (ii) was easily distracted and may respond impulsively, (iii) had difficulty with organizing and following through tasks, (iv) required "much structure" for his written tasks, (v) needed increased time limits for written tasks, (vi) required assistance in overcoming irresponsibility, (vii) lacked attention to details, (viii) had poor work-study habits, and (ix) needed assistance to assure the completion of his assignments. It also proposed remedial assistance for David eight times per week, provided for extensive use of a word processor, waived time limits for all of David's written tests and discussed in detail the annual goals and short-term objectives of the program.[57]

Even though this proposed IEP addressed the majority of the recommendations contained in the BCH report, the Hillers rejected this program because Mrs. Hiller believed the resource room assistance suggested was too extensive, (thereby keeping David out of the classroom more than she believed was necessary,) and because the IEP did not allow David to use a word processor in the classroom at all times. Since the Hillers rejected this proposed Phase I IEP,[58] David's "then current" program remained in place for the remainder of David's sixth grade because the Hillers had informed Brunswick that they would be appealing the hearing officer's decision. *See* 20 U.S.C. § 1415(e)(3), *Honig v. Doe,* 484 U.S. 305, 323–329, 108 S.Ct. 592, 604–07, 98 L.Ed.2d 686 (1988).

With respect to plaintiff's contention that full time use of a word processor was necessary for David, the court finds this position untenable. All of David's former teachers who appeared at trial testified that David could write, although they con-

---

**56.** *See* plaintiff's exhibit AF, "Effort" and "School Conduct" sections.

**57.** *See* defendant's exhibit 4. While this IEP initially proposed resource room assistance for David ten times per week, Egelson testified at trial that, in an effort to accommodate the wishes of Mrs. Hiller, Brittonkill reduced the scheduled hours of assistance of this type to only eight times per week.

**58.** While Brittonkill's revised Phase I IEP may have been superior to the original program developed by Brunswick, it is worthy of repeating that this court finds that the IEPs originally developed and implemented by Brunswick were reasonably calculated to enable David to receive educational benefits, and therefore complied with the requirements of the EAHCA.

ceded that his writing was below average.[59] While it may have been more difficult for David to handwrite his own notes and exams as opposed to using a word processor to do the same, it is clear that David could write. After carefully considering all of the evidence before it concerning this issue, this court finds that it would have been an educational disservice to this sixth grader had Brunswick permitted David to rely solely on a word processor rather than strengthening a skill as fundamental as handwriting. Additionally, the programs devised by Brunswick's CSE appropriately addressed David's handwriting deficiencies by ensuring that David utilized this skill not only when he was in the resource room, but also while he attended his mainstream classes.

### (c) The 1987–88 academic year.

■ On April 30, 1987 the Commissioner ordered Brunswick to annul its determination that David was a child with a learning disability. In response to this ruling, David was administered a new series of psychological tests in order to determine whether David in fact had a learning disability. As discussed *supra,* his scores on these exams ranged from above average to low average, with his low scores on subparts of the TOWL attributable to a combination of David's haste in completing the exam, his lack of effort, and attempt to write from memory a story he had written one year earlier. Soon after these exams were given, Brittonkill's CSE, after hearing testimony from Marcal relating to David's performance on these exams and David's sixth grade teachers, recommended that David be ineligible for special education services for the 1987–88 school year. This decision was formalized in a meeting held by the CSE on June 11, 1987. Recognizing David's right to remain in his "then current" placement while plaintiff's parents appealed the CSE's determination and not wishing to prejudice David's rights in any

way, the defendant continued to provide David with the special education components of his IEP throughout the time David attended Brunswick.[60]

As with the evidence concerning David's fifth grade at Brunswick, this court holds that the credible evidence supports a finding that David was not a handicapped child during the 1987–88 academic year. David's overall scores on the psychological tests he was administered in May, 1987 ranged from above average to low average; with below average scores on subparts of the TOWL attributable to plaintiff's personal style, rather than his physical or mental capabilities. Plaintiff's scores on these exams, coupled with the testimony of Marcal, Egelson and Dr. Vellutino, leads this court to conclude that David was not learning disabled under either New York or federal regulations in the 1987–88 school year. Therefore, Brunswick was under no obligation to provide David with special education services at this time.

### (5) Tuition and tutor expenses incurred by the Hillers.

Since January, 1988, David has been attending school at the CBA in Albany, New York, and has been tutored by various individuals, some of whom are certified in the field of special education. In this action, plaintiff's parents seek reimbursement for both the tuition they have paid to the CBA, as well as for the money they have expended in providing David with tutorial services. However, this claim is based on the assumption that (i) David is a child with a learning disability and (ii) the IEPs developed by Brunswick for David had not satisfied the requirements of the EAHCA.[61]

■ As discussed above, this court has found that David was not a handicapped child in the 1987–88 academic year, the year in which the Hillers removed their child from Brunswick, enrolled him in the CBA and implemented a tutorial program

---

**59.** *See* trial testimony of Debra Marcal, Edward C. Peck, Jr., Joanne Gallagher and Linda Dagel.

**60.** Mr. and Mrs. Hiller withdrew David from Brunswick in January of 1988.

**61.** *See* plaintiff's post-trial memorandum of law, pp. 65–75.

for David. Since he was not a handicapped child at this time, David was not entitled to special education services, nor was Brunswick under an obligation to implement an IEP for David. Additionally, the programs implemented by the defendant at the time Brunswick's CSE classified David as handicapped met all requirements of the Act.

It is axiomatic that the plaintiff would only be entitled to reimbursement for tuition and tutorial expenses if he was the prevailing party in this litigation. *See* 20 U.S.C. § 1415(e)(4), *Burlington School Committee v. Dep't. of Educ., supra,* 471 U.S. at 369–371, 105 S.Ct. at 2002–03, 85 L.Ed.2d 385, *Gregory K. v. Longview School Dist.,* 811 F.2d 1307, 1315 (9th Cir. 1987) (courts may order school district to reimburse parents' educational expenses when a school district *improperly* changes a special education placement or proposes an *inappropriate* placement.) Since the Hillers were not prevailing parties in this action, they are not entitled to reimbursement for tuition paid to the CBA, or for monies expended in providing David with tutorial services.

(6) Attorneys Fees.

Pursuant to 20 U.S.C. § 1415(e)(4)(B), the parents of a handicapped child who is the prevailing party in an action brought under the Act are entitled to an award of reasonable attorneys' fees. Since the plaintiff is not the prevailing party in this action, however, he parents are not entitled to an award of attorneys' fees.

With respect to the defendant, Brunswick similarly seeks an award of "costs, expenses, and attorneys' fees incurred by the Defendant in defending this action." [62]

Where a trial court determines that a plaintiff has brought an action under the EAHCA in bad faith, the district court has the inherent authority to award attorney fees to the prevailing defendant. *See Benner v. Negley,* 725 F.2d 446, 449 (7th Cir.1984). In the instant case, it is clear to this court that neither the plaintiff nor the defendant ever acted with any malice or in bad faith in litigating this action, but rather that both parties acted in good faith throughout the course of this proceeding. Accordingly, this court holds that both parties should bear their own costs, attorneys' fees, and other expenses.

To conclude, this court holds that:

(1) the plaintiff bore the burden of proof in this action in that he was the party challenging the findings of the administrative determination,

(2) administrative findings are to be afforded due weight in actions brought under the EAHCA,

(3) procedural violations committed by Brunswick did not deprive the Hillers of their rights under the Act and were nonprejudicial to plaintiff's parents,

(4) David was not a handicapped child during the 1985–86 and 1987–88 academic years,

(5) the program implemented by Brunswick during the 1986–87 school year was reasonably calculated to enable David to receive educational benefits, and therefore complied with the requirements of the EAHCA,

(6) plaintiff's parents are not entitled to reimbursement for tuition and tutorial expenses, nor for their attorneys' fees, and

(7) defendant's request for attorneys' fees is denied because there was no evidence that the plaintiff or his parents ever acted in bad faith during the course of this proceeding.

Accordingly, the complaint herein is dismissed and judgment shall be entered in favor of the defendant.

IT IS SO ORDERED.

---

**62.** *See* post-trial memorandum of defendant Board of Education, p. 59.