**Catherine EVANS, Parent of a disabled child, F.Z., Plaintiff,**

v.

**The BOARD OF EDUCATION OF THE RHINEBECK CENTRAL SCHOOL DISTRICT, Defendant.**

No. 95 CV 10102 (BDP).

United States District Court, S.D. New York.

June 10, 1996.

Rosa Lee Charpentier, Family Advocates Inc., New Paltz, NY, for Plaintiff.

Garret L. Silveira, Shaw & Silveira, Highland, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

## BACKGROUND

Plaintiff Catherine Evans commenced this action on behalf of her son, Frank, seeking declaratory and injunctive relief and alleging that defendant Rhinebeck Central School District Board of Education ("the District") violated the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400 et seq., and her civil rights under 42 U.S.C. § 1983, by failing to provide Frank with a "free appropriate public education" as

required under the Act. On January 29, 1996, the parties appeared before this Court on Evans' motion for a temporary restraining order and preliminary injunction enjoining the District to maintain Frank at his current educational placement, the Kildonan School, pending further proceedings.

This Court denied Evans' application for a TRO based on the evidence before it at that time, and ordered the trial on the merits to be advanced and consolidated with the hearing of the application for a preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2). A hearing on the preliminary injunction application and on the merits was conducted on April 1–2, 1996. In a decision, dated April 15, 1996, and amended May 6, 1996, the Court granted Evans' motion for a preliminary injunction, enjoining the District to maintain Frank at Kildonan, pending the Court's decision on the merits. This Memorandum Decision and Order constitutes the Court's findings of fact and conclusions of law on the merits.

Evans claims various procedural errors by the District in developing Frank's 1994–95 Individual Educational Program ("IEP") and also claims that Frank's 1994–95 IEP did not meet the substantive requirement that it be reasonably calculated to confer educational benefit. The hearing officer found in favor of the District, and the State Review Officer dismissed Evans' appeal. Although the Supreme Court has held that reviewing courts should be cautious in cases questioning the efficacy of a state educational program, *see Hendrick Hudson Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982), a thorough review of the record here has convinced the Court that the findings and conclusion of the state administrative officers simply do not merit deference. Because this review has indicated that the findings and conclusions of the state administrative officers are largely unsupported, I begin by proceeding through the evidence in some detail.

## FACTS

Frank is a fifteen year old boy of above average intelligence. He suffers from dyslexia, a severe learning disability that hinders his ability to decipher written symbols. Dyslexia has a neurological basis, and although there is no cure, a dyslexic child can learn methods to decipher words. Although Frank was not diagnosed with dyslexia until the summer of 1994, Evans testified that, from the time he entered school, Frank has had problems with spelling, reading and writing. She also testified that he has always experienced anxiety, sometimes accompanied by physical symptoms, in connection with tests.

In 1993, Evans enrolled Frank in the District's Buckeley Middle School, where he was placed in a regular education seventh grade class for the 1993–94 school year. Concerned with his difficulty in reading and spelling, Evans referred Frank to the District's Committee on Special Education ("CSE") in November of 1993. He was psychologically and educationally evaluated in December of that year.

The school psychologist, Donna Smith, reported that testing showed that Frank had a high IQ. She found that his verbal ability was superior, and that his ability to acquire information through auditory and oral modes was significantly greater than that of his peers. She noted, however, that Frank slowed down while performing visual motor tasks to assure his accuracy. She also found that writing and copying symbols were his weaknesses, but that his writing ability nevertheless appeared to be at age level.

In addition, Smith's projective testing revealed that Frank had a negative perception of his abilities in school, physical appearance, and popularity with peers, that he had "needs for security," that "[h]e feels that despite the times he works hard he 'does bad' and he 'can't get it all right,'" and that he "experiences himself as perceived as 'different' by his peers." She recommended that the CSE consider alternate ways of helping Frank obtain information in the classroom, such as having him obtain copies of class notes and teaching him alternative ways of recording information, that he receive remedial help in spelling and a spell-checker, and that his progress be monitored.

Interviewed by Smith in November 1993, Evans reported that Frank's self-image was "poor right now due to negative experience in school," that he experienced "mood swings

and frustration in regard to school," that he was frustrated with his writing, spelling and reading problem, that "he feels that he is stupid."

Using the Woodcock Johnson Achievement Test, the school special education teacher, Roberta Bloomer, performed an educational evaluation. Frank received the following grade equivalent scores:

5.8 in letter-word recognition, and
8.3 in passage comprehension, resulting in
6.5 for broad reading;
8.9 in mathematical calculation, and
10.1 in applied problems, resulting in
9.4 in mathematics;
3.1 in dictation (spelling), and
8.9 in writing samples, resulting in
4.3 for written language.

Because of Frank's weaknesses in reading and spelling, Bloomer also gave him the Boder Test of Reading and Spelling, in which Frank reportedly identified words at the 6th and 7th grade level and read on the fifth to sixth grade level, but spelled correctly only 20% of the words given to him. Bloomer noted that Frank spelled phonetically, but did not use non-phonetic spelling patterns.

The CSE met on December 10, and considered Frank's psychological and educational evaluations, but, despite what Patricia Zeisler, the chair of the CSE and principal of Buckeley, identified as "a discrepancy between ... the verbal and performance subtest scores, which often [is] associated with a learning disability," it did not classify him as a child with a disability. The CSE notified Evans that it declined to classify Frank because testing results did not indicate the presence of a learning disorder at that time. Instead, Frank received remedial instruction in reading and spelling by Bloomer, and counseling by Smith. Bloomer worked with Frank in the classroom as an inclusion teacher, helped him organize his notebook, and monitored his homework and performance in class. Bloomer also provided individual instruction to him during study periods four times a week plus one or two other 40-minute periods each week, and used glass analysis, an alternative method of word decoding with him. She also worked with him to improve his writing and spelling by using

a computer. At Evans' request, counseling was discontinued shortly after it had begun because Frank evidently did not feel comfortable with Smith.

On March 22, 1994, the CSE reconvened. Bloomer reported that Frank required more assistance to be successful in the classroom. She told the CSE that he needed help with notetaking, and developing his study and organizational skills, in addition to assistance in improving his reading, spelling and writing skills. Although no additional tests were conducted, the CSE relied upon Bloomer's oral report to recommend that Frank be classified as learning disabled. There was no written report of the basis of that determination. Zeisler testified that the CSE decided to use Frank's spelling deficit as the basis for the classification. His spelling score on the Woodcock Johnson was not reflected in his IEP, however.

The CSE further recommended that Frank receive consultant teacher services twice a day with Bloomer, and be permitted to use testing modifications, such as extended time limits, taking tests in alternate locations and giving oral responses to test questions. Frank's IEP included annual goals to improve keyboarding, writing and study skills.

According to Bloomer, Frank's testing was modified in all subject areas. He was given multiple choice questions, with short answers. Often Bloomer would read the tests to him so that he could dictate answers. Where longer writing was required, he was permitted to write in phrases, and she would later work with him to produce full sentences. Frank's homework assignments were also modified so that they were shorter. In addition, although it was not reflected in the IEP, Bloomer provided individual instruction for 40-minute periods approximately eight times per week. She worked with Frank in all subject areas, but primarily in writing. Despite these additional services and testing modifications, Frank's performance declined between March and the end of the school year.

Frank failed every major academic subject that year. He received a grade of "Unsatisfactory" in language arts, social studies, sci-

ence and mathematics. Teacher comments on his report card indicate that he had difficulty following classroom procedures, had not completed assignments and was absent a lot. Bloomer testified that Frank did not achieve any of the goals included in the March IEP.

In May, increasingly concerned about Frank's academic difficulties and emotional problems, Evans requested that Frank be independently evaluated by a private psychologist. Dr. Howard Susser assessed Frank's cognitive skills using the Wide Range Achievement Test ("WRAT"). Frank received the following grade equivalent scores:

- 9.8 broad cognitive abilities,
- 13.6 oral language,
- 2.3 long term retrieval,
- 5.7 processing speed,
- 3.5 auditory processing,
- 7.8 visual processing,
- 10.3 knowledge,
- 16.9 short term memory, and
- 16.9 fluid reasoning.

Frank also received grade equivalent scores of:

- 4 (beginning) in reading,
- 2 (end) in spelling,
- 7 (beginning) in arithmetic.

Dr. Susser reported that Frank's reading, decoding and spelling skills were impaired by weaknesses in processing speed, auditory processing and long-term memory retrieval skills, and specifically in sound blending and memory for names, but that Frank's significant strength in reasoning, comprehension, language skills and short-term memory compensated for his weaknesses. He summarized Frank's learning disability as an auditory processing deficit, a long-term retrieval or associative learning deficit and a weakness in processing speeds, which led to difficulties in spelling and decoding.

Dr. Susser also reported that emotionally and behaviorally, Frank's most significant problem was internalizing his feelings. Dr. Susser explained that Frank had two significant conflicts, the first being Oedipal, which had led to difficulty in developing independence from his mother, and the second relating to his learning disability. Dr. Susser reported that school learning could have been a route to independence and separation from his mother, but had been blocked by his academic difficulties. Dr. Susser explained that the two conflicts conspired together in such a way that Frank had difficulty in expressing his independence positively. According to Dr. Susser, Frank experienced significant anxiety and depression.

Dr. Susser recommended that Frank receive psychotherapy with a male therapist, remedial instruction in reading, writing, and spelling, and possibly use a "spell check" computer program and tape record classes. Dr. Susser also recommended that his teachers should be made to understand that comments on his report card such as "if he only worked harder, he would do better ..." would be counterproductive.

The CSE met again on June 14, before Frank's report card came out, and prepared part of Frank's IEP for the 1994–95 school year (the IEP was dated June 1, 1994). Despite Frank's complete failure in seventh grade, the District proposed to promote Frank to the eighth grade and to continue for the 1994–95 school year substantially the same modifications and services that had to date not helped him. The CSE recommended that Frank continue to receive daily individual instruction, but from special education teacher Elizabeth Villanti rather than Bloomer, and concentrating on social studies, rather than writing. The CSE also recommended that he receive the standard services given to all learning disabled students: enrollment in a 12:1 special education class for English and consultant teacher services (in math and science) two periods per day. The CSE also relied upon Dr. Susser's report to prepare a "learning plan," which suggested techniques for Frank's teachers. These techniques included many of the modifications to testing, classwork and homework that Bloomer had already begun, such as providing Frank with class notes, permitting oral responses, shortening homework reading assignments, etc.

The goals and objectives of the IEP were formulated at that meeting but were not finalized because the CSE wanted input from Evans, who was not present at the meeting.

Unable to contact Evans, however, Villanti wrote the goals herself in August.

That summer, Evans enrolled Frank, at her expense, in the summer program of the Kildonan School, a private school for children with dyslexia, which is not on the state-approved list. Students at Kildonan are taught using the principles of the Orton–Gillingham method. According to Margaret Mabie and Diana King, experts in dyslexia and the Orton–Gillingham method, because dyslexics do not learn by having someone simply tell them something, and because they cannot remember, for example, the spelling of a word by simply looking at it, they must learn through a multi-sensory procedure, using multiple sensory systems—visual, auditory and kinesthetic.

In the beginning, each letter of the alphabet must be taught to dyslexics through multi-sensory procedures. Because they cannot discriminate between sounds like most people, in order to learn a sound, they must say it, feeling its distinction in their mouths, in association with seeing it written and writing it themselves. The technical rules of a language, learned visually by many people, must also be taught to the dyslexic. For example, the dyslexic must learn that when a word begins with "k" the following vowel is "i," "e" or "y," but that most words beginning with a "k" sound actually begin with "c." Dyslexics do not learn by reading a rule, such as "i" before "e" except after "c" . . ., on the blackboard. Nor do they learn by having someone recite them a rule, even repeatedly. Rather, they a rule must be learned through daily multi-sensory drill and practice, until it becomes automatic.

In addition, according to Mabie and King, because dyslexics cannot absorb the structure of a language visually or by being told, they must learn it sequentially, starting with small units, such as the order of letters in the alphabet, gradually adding larger pieces, such as learning the spelling of sounds and how syllables are divided, and then proceeding to the rules of sentence structure and idea formation. In addition, because, through Orton–Gillingham, the dyslexic learns progressively, building upon the information that he has mastered, his confidence remains intact. Instructed in accordance with principles of Orton–Gillingham, a dyslexic's skill level remains commensurate with his abilities, and he does not experience the frustration caused by having a wide discrepancy between intellectual ability and academic achievement.

What distinguishes a dyslexic student from a low-level functioning, mildly retarded student is that the mildly retarded student may not have the capability to acquire or absorb the knowledge necessary to progress in school, but the dyslexic merely requires a different approach to learning language skills. If a dyslexic is taught language skills in an appropriate manner from the beginning of his education, he can manage effectively in a regular classroom.

When Frank arrived at Kildonan, according to King, he had "pathetically weak skills in decoding." Katherine Schantz, the current academic dean and director of admission at the Kildonan School, conducted Frank's initial interview. She discovered that Frank's family had a history of dyslexia, and her pre-testing of Frank led her to the conclusion that Frank was profoundly dyslexic. In June, Schantz conducted the following tests on which Frank received the following grade equivalent scores:

3.8 WRAT–R2 (word identification),

5.1 Gray Oral Reading (reading speed and accuracy),

6.1 Gates–Macginitie Silent Reading Test (Level 5/6K & L) (vocabulary),

4.1 Gates–Macginitie (reading comprehension),

3.1 Morrison–McCall (spelling),

3.9 IOTA,

7 WRAT–3 (arithmetic).

Schantz concluded that Frank's disability was in a very specific subskill of language, namely phonological coding, which manifested itself most profoundly in testing for sound-syllable relationships. Frank's phonological coding disability effected his spelling, his speed in reading, writing and mathematics, as well as his interpretation of reading matter. Schantz also observed that, as is typical of students where there is a wide discrepancy between intellectual potential and skill, Frank was quite frustrated and

emotionally fragile. Schantz's primary concern at that time was that Frank did not have access to reading as a way of learning, that is, he was still reading in order to learn to read, but could not use reading as a way to learn. Because of what she characterized as his "cognitive wealth," however, she believed Frank's prognoses was excellent.

Frank was assigned a male tutor for the summer and concentrated on three areas: (1) word identification so that he could read more difficult material that would sustain his interest; (2) making his handwriting more automatic because, as Schantz testified, for dyslexics the kinesthetic exercise of writing is essential in establishing sound-syllable relationships; and (3) oral reading in the context of a tutorial to assist him in establishing the speed and automation necessary to become an independent reader.

At the end of the summer, in August, Frank was tested again. The testing revealed that he had made considerable progress during the summer in the areas of word identification, reading speed and accuracy, and comprehension. He received the following scores:

8.8 WRAT–R2 (word identification),

7.3 Gray Oral Reading (reading speed and accuracy),

7.3 Gates–Macginitie Silent Reading Test (Level 5/6K & L) (vocabulary),

9.5 Gates–Macginitie (reading comprehension),

4.7 Morrison–McCall (spelling).

Schantz testified that Frank had developed certain systematic ways to attack unfamiliar words, that he had learned a whole system of what types of syllables were in the english language and how to address phonetic issues, that he was reading with greater speed and somewhat greater accuracy near grade level, although not up to his intellectual capacity, and that he could read to learn, instead of merely reading to learn to read.

In his academic report, Frank's tutor commented that Frank was a "responsible, and determined student, he completed his assignments regularly. . . . As the summer progressed, he took increasing pride in his accomplishments, and his interest increased with constant reinforcement and academic

variety." The tutor reported that Frank had made outstanding progress in his handwriting, significant progress in phonics, solid gains in spelling and that he had learned to write with more focus, detail, and organization. The tutor recommended that Frank develop a daily reading habit, that he never be penalized for spelling errors, that he should be required to use cursive writing for all written work, that he develop proficiency in keyboarding and word-processing skills, that testing and homework be modified, that he receive instruction from a trained Orton–Gillingham tutor, and that he attend Kildonan for the school year.

Over the summer, Evans requested and reiterated her request for an impartial hearing in letters dated July 5 and September 1. A hearing was not scheduled at that time, but Evans met with the District for mediation on three occasions, early in September. The parties have differing perceptions about the outcome of the mediation. Zeisler testified that she believed that the parties had agreed that the District would employ Mabie, an Orton–Gillingham trained instructor, to conduct Frank's individual instruction. Evans testified that she agreed, at Zeisler's suggestion, to have a psychiatric evaluation done by a physician for a diagnosis of dyslexia so that the CSE could make a recommendation to the Board of Education to keep Frank at Kildonan, to have Mabie "screen" Frank to determine his needs, and then to meet with the CSE again to discuss placement. She also testified that the parties agreed that Frank would remain where he was, at Kildonan, until another arrangement could be worked out.

Mabie testified that when Zeisler called her, she agreed to meet with Frank and do a quick screening. She never made a commitment to the District, but indicated that she would try to fit him into her schedule. She testified, however, that she agreed to the screening before she knew anything about Frank's background. Ultimately, Mabie never did the screening because she did not have time, but also because she began to "question[ ] whether an hour a day with me was all this child needed." Mabie felt that Frank was in "very bad shape." "When I saw his

background I felt that my one hour a day was just, you know, this much (indicating) and he needed a whole lot more."

By this time, however, Evans had enrolled Frank in the Kildonan School for the 1994–95 school year. At Kildonan, Frank continued the tutorial, at a frequency of five times per week for 45 minutes, that was started in the summer. His schedule included prealgebra, preliminary chemistry/physics, American history, literature and studio arts/ceramics, in addition to a proctored study hall and an individual tutorial. Each class was taught by an Orton–Gillingham trained teacher who presented the material using the Orton–Gillingham method. Through the course of a period, the materially was presented both orally and in writing, and assignments were both oral and written. In addition, testing was modified as necessary. Frank was "fast-tracked" with intellectually superior students who were very similar in profile in terms of being dyslexic or dysgraphic, although some did not have Frank's degree of difficulty in reading.

Schantz testified that in terms of content, Frank's classes were not modified, but that the volume of independent work was reduced. She observed that his motivation increased noticeably over the year, he was inspired by books that he was reading in his literature class, he was much more engaged, he made friends, he felt challenged intellectually and was responding well, and he was well adjusted and well-liked by his teachers.

Kildonan conducted its regular mid-school year battery of tests in February of 1995, on which Frank received the following scores:

8.2 Woodcock–Johnson (letter/word identification),
3.3 Woodcock–Johnson subtest (word attack),
11.3 WIAT (reading comprehension),
4.7 Barnell–Loft (spelling).

Schantz explained that Frank exhibited no notable progress on the word attack subtest because it specifically isolated his deficit. Because this deficit is part of his neurological make-up, when isolated, it will remain largely unchanged. Frank's report card for the end of the 1994–95 fall term indicated that his reading had progressed, and that he had a good grasp of pre-algebra. Although he still needed work on writing and sequencing, he was generally doing considerably better in a number of other areas.

But, in September of 1994, as Frank began the fall term at Kildonan and the parties grew frustrated with mediation, an impartial hearing was scheduled for the 21st. It was later adjourned with the consent of both parties until October 26. Meanwhile, Evans received a letter notifying her of a CSE meeting on October 4. The letter stated that the purpose of the meeting was to "review placement at Kildonan," and "Program Review (increase or decrease level of services)."

On October 4, Evans met with the CSE and requested that the CSE recommend placement at Kildonan. She testified that she was asked to bring along a representative from Kildonan so that placement there could be considered. King, the founder and former director of the Kildonan School, attended the CSE meeting, discussed Frank's participation in the School's summer program, and recommended that Frank attend the Kildonan School as a residential student during the 1994–95 school year. The CSE also considered a letter from Dr. Harold Levinson, who evaluated Frank over the summer, and who opined that Frank had "dyslexia secondary to a cerebellar-vestibular dysfunction." Dr. Levinson recommended that Frank remain at the Kildonan School.

The CSE, however, recommended placement in the District's school and amended Frank's IEP for the 1994–95 school year by replacing the individual instruction in social studies with individual, multi-sensory instruction in reading and writing for 60 minutes four days per week with Mabie—as the parties had discussed at their mediation—and inserting counseling for 30 minutes per week by a private psychologist who would consult with the school psychologist twice per week. Annual goals relating to American history and keyboarding were deleted, and new goals relating to mathematics and counseling were added. In describing Frank's current level of functioning, the IEP incorporated two scores, in reading comprehension and vocabulary, from Kildonan's August 1994 testing.

Disagreeing with the CSE's placement recommendation, Evans insisted that the hearing scheduled for October 26 proceed.

As noted above, following that meeting, Mabie declined to provide the multi-sensory services to Frank. Thus, the District was not in a position to implement its IEP. On October 26, the parties met just prior to the commencement of the impartial hearing. At that meeting, the parties came to an agreement that obviated the need for a hearing. The terms of that agreement are highly disputed, but the result was that the impartial hearing was called off and Frank continued at the Kildonan School at the expense of the District. The parties asked the hearing officer to retain jurisdiction, in the event that there was a subsequent disagreement.

On Nov. 7, the District hired a substitute multi-sensory reading and writing instructor, Constance Moore, who was to tutor Frank 40 minutes each day and spend the extra 20 minutes of the hour consulting with Frank's core curriculum teachers. Moore is currently a private tutor. She has a teaching degree in elementary education, and a permanent teaching certificate for kindergarten through sixth grade. She has taught kindergarten, second grade and elementary reading, and at least one highschool boy. She is not certified in either special education or Orton–Gillingham instruction. She taught at the Kildonan school part-time for three years, and full-time for five years, where for less than a year, she was trained in Orton–Gillingham instruction by King.

King testified that Moore is not qualified "for work with an adolescent. Under supervision, in a structured supervision she works well with young children.... With an adolescent you have to be prepared to go into the more advanced language skills. You have to be well organized and appropriate in your relationships with an adolescent." King testified that Moore is not qualified in those areas of work required by adolescents. She further testified that Moore is not qualified or competent to instruct, train or otherwise consult with other teachers as to how to work with a specific student under the Orton–Gillingham approach.

Sometime after November 14, Evans informed Zeisler that she had spoken with Moore and concluded that she was not qualified to provide Frank with the instruction he required. In a letter, dated December 5, Zeisler informed Evans that the District would no longer be responsible for paying Frank's tuition at the Kildonan School. In response, Evans requested another meeting of the CSE, and in a letter dated January 4, 1995, she requested an impartial hearing.

The CSE did not meet until January 19. Thus, it was not until January 19 that Frank's IEP was amended to reflect the changes made after Mabie declined to accept Frank as a student and the parties came to their October agreement that obviated the need for a hearing. On January 19, Evans reiterated that she would pursue the impartial hearing. The District agreed at that time to pay Frank's tuition at the Kildonan School until the hearing officer rendered his decision.

The impartial hearing began on February 8 and, after 11 sessions, concluded on June 6. In his decision, dated July 10, the hearing officer found that the current designation of Frank's handicapping condition was "unknown," that the District was reasonable in proceeding cautiously in classifying Frank when he first arrived in the District, that a detailed plan of action for addressing Frank's needs was agreed to after the CSE meeting in June of 1994, that "[t]here is nothing in the record to refute the fact that the school district established an appropriate IEP for [Frank] for 1994–95," that the record indicated that the District had complied with the procedural requirements for preparing Frank's IEP for the 1994–95 school year and that the IEP was reasonably calculated to provide education benefit in the least restrictive environment. He directed the District to put in place immediately a program similar to that outlined in the October 1994 IEP, but also to update it.

Evans appealed this decision to the State Review Officer. In a decision dated September 29, 1995, the State Review Officer dismissed the appeal on the grounds that the IEP proposed by the CSE was appropriate

and that it was available as of January 19, 1995.

Except for a brief period following the District's decision to terminate its tuition payments on December 5, 1994, Frank attended the Kildonan School at the District's expense from October 1994 until December 1995. Evans made two unsuccessful attempts to send Frank to Rhinebeck's high school in January and February of this year, but Frank ran away. Thus, Frank has not attended any school from January through April of this year, when this Court granted Evans' motion for a preliminary injunction.

**DISCUSSION**

### 1. *Legal Standards*

■ The IDEA permits an aggrieved parent to bring an action in district court. In reviewing the decision of the state educational agency,

> [t]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

The role of the reviewing court, however, is circumscribed. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051, cautioned that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." The Court held that "due weight" must be given to the state administrative proceedings. *See Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. In this regard, "[a] number of other courts, including the Second Circuit, have held that the administrative findings in lawsuits brought under the [IDEA] should be accorded some degree of deference." *Mavis v. Sobol,* 839 F.Supp. 968, 986 (N.D.N.Y.1993) (quoting *Hiller v. Board of Educ.,* 743 F.Supp. 958, 968 (N.D.N.Y.1990)). *See Karl v. Board of Educ.,* 736 F.2d 873, 876–77 (2d Cir.1984).

In assessing the appropriateness of the educational program offered by the state, *Rowley* held that the proper inquiry is two-fold: "First, has the State complied with the procedural requirements set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3051. As the party challenging the findings of the administrative determination, Evans has the burden of proof. *See Hiller v. Board of Educ.,* 743 F.Supp. 958, 967–68 (N.D.N.Y. 1990).

### 2. *Procedural Requirements*

Detailed procedural provisions lie at the heart of the IDEA. These processes are designed to guarantee that each handicapped student's education is tailored to his unique needs and abilities. The Act, and the regulations promulgated pursuant to it, contain procedures for determining whether the appropriate placement is regular or special education, for preparing an IEP, for changing the placement or the IEP, and for removing the child from regular education. 20 U.S.C. §§ 1412 & 1415; 34 C.F.R. §§ 300.300– 300.576. "The Act's procedural guarantees are not mere procedural hoops through which Congress wanted state and local educational agencies to jump. Rather, 'the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decisionmaking.'" *Daniel R.R. v. State Board of Educ.,* 874 F.2d 1036, 1041 (5th Cir.1989) (quoting *Jackson v. Franklin County School Board,* 806 F.2d 623, 630 (5th Cir.1986)). Both Congress and the Supreme Court place great importance on the procedural provisions incorporated into § 1415. *See Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050 ("the importance Congress attached to these procedural safeguards cannot be gainsaid.").

■ A violation of the Act's procedural guarantees may be a sufficient ground for holding that a school system has failed to provide a free appropriate public education and, thus, has violated the Act. *See Daniel,* 874 F.2d at 1041. Procedural flaws do not automatically require a finding of a denial of a free appropriate education, but procedural inadequacies that result in the loss of educational opportunity clearly result in the de-

nial of a free appropriate education. *See W.G. v. Board of Trustees*, 960 F.2d 1479, 1484 (9th Cir.1991) (citing *Burke County Board of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir.1990).

■ Evans raises four claims of procedural error: (1) failure to convene an impartial hearing within 45 days of her request on July 7, 1994, in violation of 34 C.F.R. 300.512(a); (2) failure to have a proper IEP ready to implement at the start of the school year, in violation of 34 C.F.R. §§ 300.342; (3) failure to include in the IEP a statement of Frank's present level of educational functioning and strategies to evaluate progress, in violation of 20 U.S.C. § 1401(a)(19) and 34 C.F.R. §§ 300.346(a); and (4) failure, when developing the IEP, to include Frank's classroom teacher in the evaluation team, to conduct a classroom observation of Frank, and to prepare a written report that included a statement of the basis for the determination that Frank was learning disabled, in violation of 34 C.F.R. §§ 300.543, 300.344(a)(1)–(2) & 300.540(a)–(b). I discuss each alleged error in turn.[1]

■ In a letter, dated July 7, 1994, Evans requested an impartial hearing. A hearing was not scheduled, however, until September 21, after the school year had begun. The IDEA's implementing regulation provides that the District "shall ensure that not later than 45 days after the receipt of a request for a hearing ... a final decision is reached in the hearing." 34 C.F.R. § 300.512(a)(1). Although a hearing officer may grant an extension of the 45–day limit at the request of either party, *see* 34 C.F.R. § 300.512(c), here, a hearing was not even scheduled until 71 days after Evans' request. Instead, the District arranged for mediation of the dispute.

The hearing officer made no specific findings or conclusions in connection with this alleged procedural violation. The State Review Officer specifically found that the District had failed to schedule promptly a hearing and found that it had offered no factual basis or legal authority in support of its argument that Evans waived her right to receive a written decision of the hearing officer within 45 days by agreeing to mediation. However, after noting "that both parties bear responsibility for the protracted proceeding which has occurred," the State Review Officer merely admonished the District to "ensure that hearings are commenced promptly after it receives hearing requests."

The Act, however, was intended to ensure prompt resolution of disputes regarding appropriate education for disabled children. This includes, of course, the administrative review process. The legislative and administrative concern for prompt final resolution has been reflected in judicial opinions. *See e.g. Spiegler v. District of Columbia*, 866 F.2d 461, 466–67 (D.D.C.1989). Section 300.512(a) specifically sets forth that it is the District's duty, and not the parent's, to ensure that a timely hearing and decision takes place after the parent requests an impartial hearing of the IEP decision. Thus, I believe that the State Review Officer's admonishment falls short of the· mark, but I do not rest my decision on that basis alone.

Evans next alleges that the District failed to have a proper IEP ready to implement at the start of the new school year. The hearing officer found that the October 1994 IEP "was determined appropriate upon [Frank]'s arrival in the Rhinebeck School System at that time."[2] The State Review Officer

---

1. The District argues that Evans failed to raise these procedural violations both in her complaint and in the administrative proceedings below. The complaint, however, states a claim for procedural violations of the IDEA. The complaint need not set forth the plaintiff's theory of recovery. Evans also discussed each alleged violation in her pre-trial brief so that the District was free to adduce evidence or supplement the record at the hearing before this Court. In addition, a litigant is generally free to amend a complaint to conform with the evidence at any time during the proceedings. *See* Federal Rules of Civil Procedure 15(b). Finally, this Court finds that, although the hearing officer did not make specific findings in regard to some of the alleged procedural violations, the record reveals that the alleged violations were repeatedly raised below.

2. Frank entered the Rhinebeck School System in October of 1993. This finding about the October 1994 IEP is mentioned first in the hearing officer's chronological march through the evidence. The language of the hearing officer's finding— "upon [Frank]'s arrival in the Rhinebeck School System"—and its erroneous placement in the

found, however, that there was no dispute that the IEP which the CSE recommended on October 4 could not have been implemented at that time, because Mabie, who was to provide individual tutoring, had declined to provide her services. The State Review Officer found that, although a change in a child's service provider is not normally considered to be a change in a child's program, upon hiring Moore, the District also intended to change the amount of service, which required an amendment to Frank's IEP by the CSE. Thus, the State Review Officer found that the District "did not have an appropriate program" until January 19, 1995 when it amended Frank's IEP, and thus by implication, that the District did not have an appropriate program at the start of the school year.

■ Under the IDEA, the general rule is that placement should be based on an IEP. *See* 34 C.F.R. § 300.552. The IDEA's implementing regulation provides that

> [a]t the beginning of each school year, each public agency shall have in effect an IEP for every child with a disability who is receiving special education from that agency.... An IEP must ... [b]e in effect before special education and related services are provided to a child; and ... [b]e implemented as soon as possible following the [CSE] meetings.

34 C.F.R. § 300.342. The note following this provision states that "it is expected that the IEP of a child with a disability will be implemented immediately following the [CSE] meetings."

Here, as the State Review Officer found, the District did not have an appropriate program in effect until Frank's IEP was revised in January 1995, four months into the 1994–95 school year. Thus, the District's decision to place Frank at Buckeley at the start of the 1994–95 school year, before it had an IEP in effect on which to base that placement, constitutes a procedural violation of the Act. *Cf. Spielberg v. Henrico County Public Schools,* 853 F.2d 256, 259 (4th Cir.1988).

chronology leads this Court to the conclusion that the hearing officer was confused about when

■ The third alleged procedural error is the failure to include in the IEP a statement of Frank's present level of educational functioning and strategies to evaluate his progress, in violation of 20 U.S.C. § 1401(a)(19) and 34 C.F.R. §§ 300.346(a)(1), (2) & (5). Under the Act, an IEP must be a written statement of specially designed instruction to meet the unique needs of a handicapped child, which includes:

> (A) a statement of the present levels of educational performance of such child; (B) a statement of annual goals, including short-term instructional objectives; (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs; (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(a)(19); *see also* 34 C.F.R. §§ 300.346(a)(1), (2) & (5).

Frank's October 1994 and January 1995 IEPs listed his IQ test scores, as well as broad reading, broad mathematics, broad written language, and general knowledge scores, from evaluations performed by the CSE in December 1993. In addition, they included two test scores—in reading comprehension and vocabulary—from a test administered at the Kildonan School in August 1994. Based on this information, the State Review Officer found that the IEPs stated Frank's current level of educational performance. (The hearing officer made no specific finding with regard to whether the IEPs set forth Frank's present level of educational functioning.)

Both IEPs, however, fail to establish with precision Frank's individual needs. Frank's current level of functioning for reading and writing was presented in a broad score, thereby masking his areas of deficit, according to uncontroverted expert testimony. According to Schantz, who has expertise in the

the October 1994 IEP was developed and implemented.

fields of clinical psychology and intellectual, emotional and social testing, the Woodcock Johnson has a subtest in word attack skills, on which Frank, as is typical of dyslexics, scores much lower. The broad, composite score for reading depresses his reading comprehension abilities, which are actually much higher than indicated, but inflates his word attack skills, his area of deficit. As a result, Frank's needs cannot be accurately projected based on a broad score.

Neither IEP reveals Frank's scores in spelling or word attack—those areas where his deficit most profoundly manifests itself—in spite of extensive evaluations carried out by Dr. Susser and at Kildonan and which were available to the CSE. There is no indication in the record why only two of the scores from the test administered by Kildonan were included in the IEP, or why those two scores in particular were included.

Mabie, the Orton–Gillingham trained instructor hired by the District originally to tutor Frank, who, at her own learning center established ten years ago, educationally evaluates primarily dyslexic students, testified that the testing results reflected in the IEP did not give her the type of information she needed to identify Frank's areas of deficit. As a result, she inquired of the District whether she could do her own testing. She testified that she,

> found [the IEP] confusing.... [I]n the comprehension they had a score of 9.5. My first reaction was why is this child, he is in ninth grade, why is he having a problem if he is reading at grade level. It didn't make much sense to me. And then it had broad reading, 6.5; written language of 4.3. I didn't see any spelling score at all and it just did not give me enough. I wanted to find out where the difficulty—in other words, I wanted to give him a test so I could find out what his work attack skill was, word identification, word comprehension, passage comprehension.

In addition to masking his deficit, most of the scores used to describe Frank's current level of educational functioning were obtained as a result of testing done in December 1993. Thus, the October 1994 IEP essentially described Frank's level of func-

tioning ten months previously and the January 1995 IEP described Frank's level of functioning from the previous year. The District's own witness, Zeisler, even conceded, in connection with the June 1994 IEP which differed from the October 1994 and January 1995 IEPS only in that it did not include the two scores from the Kildonan testing, that the IEP did not reflect Frank's current functioning level, because he was not to be tested again until the fall of 1994.

Even if I were to defer to the State Review Officer's finding that the IEP adequately described Frank's current functioning level, notwithstanding the fact that it wholly failed to identify his particular areas of deficit and was based on information that was at least ten months old, I still find that the IEPs did not adequately set forth strategies for evaluating progress, in violation of 20 U.S.C. § 1401(a)(19) and 34 C.F.R. § 300.346(a)(2). The Act's requirement of periodic and individualized assessments of each handicapped child evinces a recognition that children develop quickly and that a placement decision that may have been appropriate a year ago may no longer be appropriate today.

Neither the hearing officer nor the State Review Officer made a specific finding in connection with whether Frank's IEP provided adequate short term instructional objectives. Appendix C defines "short term instructional objectives" as "measurable, intermediate steps between a handicapped child's present level of educational performance and the annual goals that are established for the child." 34 C.F.R. ch. 3, App. C, question 39. The objectives are to "serve as milestones for measuring progress toward meeting the [annual] goals." 34 C.F.R. ch. 3, App. C, question 39. They "provide a mechanism for determining ... whether the child is progressing in the special education program ... and whether the placement and services are appropriate to the child's special learning needs. In effect, these requirements provide a way for the child's teacher(s) and parents to be able to track the child's progress in special education." 34 C.F.R. ch. 3, App. C, question 37.

The IEPs include only broad, generic objectives and vague, subjective methods for monitoring Frank's progress. For example, the first goal in Frank's October 1994 IEP provided that he would be evaluated on the listed objectives by reference to "teacher observation" and "80% accuracy." With reference to the second goal, the October 1994 IEP provided that Frank would be evaluated by "teacher observation" and "80% success." Although the IEP repeatedly incants these phrases—"teacher observation," "80% success"—because there is little indication of what Frank's level of success was when the IEP was written, it fails to specify strategies for adequately evaluating Frank's academic progress and determining which teaching methods are effective and which need to be revised. Again, Zeisler conceded, with regard to the June 1994 IEP, which used the same mantra to a large extent, that it did not set forth measurable criteria to assess progress.

Villanti's testimony is also enlightening on this issue. She had not met Frank when she wrote the goals and objectives that appear on the October 1994 and January 1995 IEPs, but based them on information that she acquired from Bloomer, Smith and Zeisler at the June CSE meeting. Villanti wrote a goal that Frank would increase computation skills in math at the eighth grade level, but testified that she had no idea why he had failed seventh grade math. She wrote a goal for eighth grade physical science, but testified that she did not know whether he had passed seventh grade science or what his functioning level was in physical science. She wrote a goal for spelling, but testified that she did not know what his functioning level in spelling was. She testified that she did not know why there were no goals for the individual instruction in social studies that she was to provide Frank. Finally, she testified that she did not know why the IEP did not reflect the other scores obtained from testing by Kildonan, the fact that Frank failed every subject his seventh grade year, or teacher information.

■ The fourth procedural failure raised by Evans is the District's failure, when developing the 1994–95 IEPs, to include Frank's classroom teacher in the evaluation team, to conduct a classroom observation of Frank, and to prepare a written report that included a statement of the basis for· the determination that Frank was learning disabled, in violation of 34 C.F.R.· §§ 300.543, 300.344(a)(1)–(2) & 300.540(a)–(b).

Neither the hearing officer nor the State Review Officer made specific findings with regard to the fourth alleged procedural violation. The CSE has never prepared a written report that included a statement of the basis for the determination that Frank was learning disabled. Rather, he was classified in March 1994, based upon Bloomer's oral report to the CSE, that Frank required more assistance to be successful in the classroom. The minutes from this CSE meeting are perfunctory. They state only that "Mrs Bloomer reported on individual reading and spelling work. Organized notebook & folder for every subject. Helped him with his Expo 94 project." Although Zeisler testified that the decision to classify was based upon his deficit in spelling, Frank's level of functioning in spelling has never appeared on any IEP.

Evans also alleges that Frank's 1994–95 IEPs were not developed with input from his teachers at Kildonan, in violation of 20 U.S.C. § 1401(a)(19) and 34 C.F.R. § 300.344(a)(2). A classroom observation was never conducted at Kildonan, and none of Frank's teachers at Kildonan ever attended a CSE. meeting.

However, Bloomer, Frank's special education teacher during his seventh grade year, attended the CSE meeting in June 1994, at which Frank's 1994–95 IEP was substantially developed. In addition, King attended the CSE meeting in October 1994, in which the IEP was amended to include some information from the summer program at Kildonan. At that meeting, King discussed Frank's par-. ticipation in the summer program at Kildonan. Although Frank's 1994–95 IEP. could only have been improved by a classroom observation at Kildonan and participation of people knowledgeable. about his particular learning disability and his experience in the summer program and at Kildonan itself, in light of Bloomer's participation in the June 1994 meeting and King's participation in the

October 1994 meeting, the Court finds that any violation in this regard was not alone sufficient to result in the loss of educational opportunity.

■ When viewed in light of the standards discussed above, the hearing officer's decision that the District met the necessary procedural requirements is unsupported by the facts of record and incorrect as a matter of law. Uncontroverted testimony, for the most part, establishes that the District did not convene an impartial hearing within 45 days of Evans' request and did not have an IEP ready to implement at the start of the school year, did not include in the IEP a statement of Frank's present level of educational functioning, specifically in his areas of deficit, did not include in the IEP a statement of objective strategies to evaluate progress, and did not prepare a written report of the basis for the determination that Frank was learning disabled. The nature and number of these procedural violations support only one conclusion—that Frank was not given the educational opportunity that the procedural requirements of the IDEA were intended to protect.

### 3. *Substantive Requirement*

■ A school district is not required to implement a program that will maximize the handicapped child's potential. *Rowley,* 458 U.S. at 198–99, 102 S.Ct. at 3046–47. Rather, a handicapped child has a right to "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. *Rowley* explained that

> [i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child.... We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

*Rowley,* 458 U.S. at 200–02, 102 S.Ct. at 3048.

■ The view held by the District and adopted by the hearing officer and the State Review Officer is that Frank's 1994–95 IEP was reasonably calculated to confer educational benefit. Although this Court is required, in recognition of the expertise of the administrative agency, to give some deference to the conclusions of the hearing officer and the State Review Officer, I note first that there is a discrepancy between the findings of the hearing officer and the State Review Officer. While the hearing officer found the IEP of October 4, 1994 appropriate, the State Review Officer found that the District did not have an appropriate IEP available until the October 1994 IEP was amended by the CSE in January 1995. More importantly, however, a comprehensive review of the record reveals that the District's view, and the conclusion of the hearing officer and State Review Officer, are directly contradicted by the testimony of each of the experts on dyslexia.

The testimony of the experts on dyslexia clearly establishes that to benefit educationally Frank requires an intensive program of individualized, integrated, multi-sensory, sequential training. Katherine Schantz, a doctoral student at Harvard University in consulting psychology, with professional and clinical experience in therapy and testing of children, and fifteen years experience with learning disabled adolescents, dyslexics in particular, testified that dyslexics are very difficult to teach, particularly those like Frank in whom the discrepancy between intellectual ability and skill is wide. She testified that in order to learn dyslexics need more drilling in all systems—auditory, visual and kinesthetic—and more personal contact than other students. She testified that a severely dyslexic student such as Frank needed specific training in a multi-sensory, sequential approach on a daily basis. She further testified that because Frank is dyslexic, he could learn only through the use of such a method.

Schantz expressly denied that anything less than an intensive program of study through a multi-sensory, sequential approach

could confer educational benefit. She explained that the danger is that any other approach would not take into account Frank's social and emotional fragility. She testified that dyslexic students, and particularly Frank because of his wide discrepancy between ability and skill, are emotionally fragile and at risk for depression. She stated that particularly severe dyslexics must be carefully schooled so that their self-image progresses, and thus, they benefit greatly from being with other dyslexics for a period of time so that they understand they are not alone in their struggle.

Schantz further explained that merely having a trained tutor explain the needs of such students to academic core subject area teachers who are not trained in an appropriate approach, as the District proposed, would not be sufficient because not only would it exacerbate Frank's emotional and social difficulties by singling him out for special attention, but that mere modifications to classwork and homework were not adequate. The presentation of the subject matter had to be done differently. She testified that counseling in such a setting would not assist Frank and that he was not secure enough with his disability to be returned to a mainstream environment.

Diana King, who has 45 years of experience in the education of dyslexic students, has founded a school for dyslexics, and has lectured and trained teachers both in the United States and abroad for 40 years, testified that Frank's disability was such that it should have been identified before he entered first grade, and that his years of failure had exacerbated his condition. King testified that it would not be appropriate to return Frank to a regular education classroom, even with a daily 40–minute tutorial by a multisensory trained teacher. She stated that to change the program that is currently working for Frank would put him at risk for even more profound educational failure.

Margaret Mabie has a bachelor's degree in psychology and master's degrees in special education and administrative supervision, as well as significant graduate hours in teaching techniques, primarily Orton–Gillingham, for dyslexic students. She was an assistant professor for 15 years at the State University College at New Paltz, where she started a special education program. She has also taught reading in middle school and high school, and has had her own learning center for ten years, where she does educational evaluations of mainly dyslexic students, teaches math and trains teachers. She has also taught graduate education classes in language procedures at Columbia University. Mabie has never been employed by the Kildonan School.

Mabie testified that Frank does not have the ability to benefit from regular education classes and that a daily 40–minute instruction using a multi-sensory, sequential approach could not meet his needs. She explained that with such a session he could not even begin to address the primary difficulties he experiences in reading, writing or spelling. She testified that even with one hour of service a day, it would be very hard for Frank to participate in the other regular education programs for the rest of the day. In fact, she testified that Frank would be "in deep trouble in high school subjects," going from one teacher to another, even with compensatory help. She stated that it would take a couple years before he would be able to survive in a regular classroom.

Mabie further testified that although regular academic subject teachers should be advised as to Frank's difficulties, she explained that there is a "big gap" between telling them what to do and their knowing what to do or how to do it. She explained that the situation is such, that is with the numbers of students regular education teachers have and the demands made upon them, that they are not able to adapt their presentation of subject matter nor able to devote the time needed to a particular student or group of students. For example, she testified, typically a dyslexic student will be given a spell check as a way to address his difficulties with spelling. She explained that a spell check does not work well with dyslexics because in order to use a spell check, one must have some idea of the correct word when given a choice of words. Dyslexics, however, are unable to remember the spelling of a word simply by looking at it.

These experts all had the opportunity to review Frank's educational records and/or assess him. According to each one, the program currently proposed by the District to educate Frank is not reasonably calculate to provide him with educational benefit, and in fact may harm him. The concordance of these experts on dyslexia, in conjunction with the record evidence, unmistakably demonstrates the accuracy of their conclusions. Their expert opinion is borne out by the fact that Frank's academic performance showed no improvement and even deteriorated since he began receiving special education at Buckeley.

*Rowley* held that in the regular education system, "[t]he grading and advancement system ... constitute[ ] an important factor in determining educational benefit." *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049; *accord Angevine v. Jenkins,* 752 F.Supp. 24, 27 (D.D.C.1990). *Rowley* explained that:

> the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Rowley,* 458 U.S. at 203–04, 102 S.Ct. at 3049.

Here, Bloomer testified that despite her intensive individual instruction eight times per week, and homework and classwork modifications, Frank's performance declined. In fact, he failed every major academic subject of his seventh grade year. The only significant service changes incorporated in his 1994–95 IEP—beyond the services that were being provided between March and June of Frank's seventh grade year—were placement in a special education English class and a multi-sensory tutorial.

■ There is no evidence in the record, however, as to the profile of the proposed special education English class, except that provided by the District in response to a request from Evans made in July 1994. Neither the exhibit nor the testimony of the District's witnesses provides any indication of whether Frank and the other students are appropriately grouped in terms of their academic or educational achievement and learning characteristics, and social and emotional development. In fact, the class profile as of July 1994 appears to place Frank with a hearing impaired student and a speech impaired student, as well as two other learning disabled students, whose learning disability is unspecified. Information on the class profile is vital because the capabilities and needs of the other students in the proposed class are relevant factors in determining whether Frank's placement in such a class would benefit him educationally.

The record also fails to establish that the multi-sensory tutorial is reasonably calculated to confer some educational benefit on Frank. In addition to the testimony of the experts on dyslexia that Frank will not benefit from a daily 40–minute multi-sensory tutorial, there is compelling evidence that the proposed instructor was not qualified to teach adolescents or to instruct, train or otherwise consult with teachers as to how to work with Frank using the approach he requires. The proposed instructor is neither certified in special education nor in Orton–Gillingham instruction. The person who trained the proposed instructor in Orton–Gillingham testified in no uncertain terms that the proposed instructor was not qualified to work with Frank, nor to consult with his regular education teachers about how to work with Frank.

■ *Rowley* has explicitly cautioned that the IDEA contemplates meaningful access to a public education: "[i]t would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education." *Rowley,* 458 U.S. at 200–01, 102 S.Ct. at 3048. Even a showing of minimal improvement on some test results would not compel a finding that an IEP is reasonably calculated to confer some educational benefit. Courts have agreed that "[t]he Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Daniel R.R.,* 874 F.2d at 1048;

*Hall v. Vance County Board of Educ.*, 774 F.2d 629, 636 (4th Cir.1985) ("Clearly, Congress did not intend that a school system could discharge its duty under the IDEA by providing a program that produces some minimal academic advancement, no matter how trivial."); *Chris D. v. Montgomery County*, 753 F.Supp. 922, 931 (M.D.Ala.1990) ("The Act requires a plan of instruction under which educational progress is likely.")

The uncontroverted testimony of the experts on dyslexia demonstrates that an integrated, multi-sensory, sequential method is a necessity rather than an optimum situation for Frank, because of the nature and severity of his dyslexia and his associative emotional problems. Thus, in holding that the District's IEP is not reasonably calculated to confer educational benefit on Frank, this Court has not been unfaithful to *Rowley*'s directive that "courts must be careful to avoid imposing their view of preferable education methods upon the States." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. Evans' claim has not presented a contest of experts in which a court must choose between competent expert testimony presented by opposing parties. While the District presented evidence from experts in special education, none has any specific expertise in the area of Frank's disability.[3]

█ In addition, Schantz's expert opinion as to Frank's emotional fragility, and its impact upon his ability to function in a regular school classroom, is borne out not only by overwhelming evidence in the record below, but by the additional testimony of Dr. Sal Massa presented to this Court at the hearing on April 2, 1996. According to Schantz, Frank made significant progress, both aca-

demically and emotionally, at Kildonan because he was schooled in a method that permitted his skill to develop at a level commensurate with his intellectual ability.[4] Dr. Susser's report indicates that Frank has experienced significant emotional conflict, anxiety and depression directly associated with his learning disability. Each of the experts on dyslexia testified that Frank exhibited an incapacitating sense of frustration that is typical in severe dyslexics whose intellectual abilities are significantly greater than their level of achievement.

The District terminated its funding of Kildonan following the issuance of the State Review Officer's decision. At the time of the hearing before this Court on April 1–2, 1996, Frank had not attended school since December 1995. Massa, a school psychologist with a Ph.D in Clinical Psychology and considerable experience with learning disabled students, testified that Frank's current emotional problems have effected his academic performance to such an extent that he ought now not to be classified simply as learning disabled, but as multiply handicapped. Based upon meetings with Frank in February and March 1996, and a review of his records, Dr. Massa diagnosed Frank with an adjustment disorder. He testified that an adjustment disorder, by its nature, is specific to a situation. In Frank's case, it is specific to the public school situation, which for him is associated with failure. He has neither adjusted to being out of school nor to the prospect of returning to Buckeley.

The testimony and documentary evidence tell a compelling story of a very intelligent, but emotionally vulnerable, child who is at great risk of dropping out of school, despite a demonstrated capacity to succeed aca-

3. The District presented testimony from two of its special education teachers. Although both have masters degrees in special education or learning disabilities, neither has any apparent expertise in dyslexia. The District also presented testimony from the school psychologist, who has a master's degree in school psychology, but no apparent expertise in dyslexia. Finally, Zeisler has a master's degree in reading problems and a Ph.D in organizational structures in connection with special education decision-making. While Zeisler has considerable experience with education of the learning disabled, she also has no apparent expertise in the education of dyslexics.

4. My reference to Frank's progress at Kildonan is not inconsistent with the IDEA's "reasonably calculated to confer educational benefit" standard. I am mindful of the fact that a district court is not to decide which program offers the greatest benefits to a child, but whether the program offered to the child by the District enables him to receive educational benefits. The fact that Frank made good progress at Kildonan is merely an indication that that type of program was appropriate and effective.

demically, socially and emotionally in an appropriate program. The expert testimony establishes that, the nature of Frank's dyslexia in conjunction with his emotional problems, is such that he needs an intensive program of individualized, integrated, multisensory, sequential training with students of similar needs. The IEP proposed for Frank is not such a program, and therefore cannot meet his needs.

■ It does not appear to this Court that either the hearing officer or the State Review Officer considered the testimony of the experts on dyslexia. Because the officers' conclusions are unsupported by the record as a whole and incorrect as a matter of law, they simply does not merit deference.[5] *See P.J. v. State of Connecticut,* 788 F.Supp. 673, 679 (D.Conn.1992). In addition, given the overwhelming evidence of the significant relationship between Frank's academic performance and his emotional problems, the officers could not have reasonably concluded that Frank's education was not significantly impeded or adversely affected by his emotional difficulties, which are directly associated with his learning disability.

While the 1994–95 IEP certainly touches upon some of the necessities for Frank to benefit from an educational program, as the court has already found, it reduces or omits several of the types of services that those who know Frank, and have expertise and experience in his type of learning disability, believe are essential to his benefiting from an educational program. For instance, one such omission involves the presentation of subject matter in a multi-sensory, sequential manner.

The failure to use an approach that will provide Frank with the tools to become, for example, an independent reader is alone an important reason why the District's IEP does not provide an appropriate education. Therefore, neither prong of the *Rowley* test has been met under the facts, and Evans is entitled to relief under 20 U.S.C. § 1415(e)(2). In fashioning remedies for violations of the IDEA, the court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The court's discretion in fashioning relief is broad. *Burlington School Committee v. Dept. of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985).

In light of the foregoing, Evans is entitled to a declaratory judgment, and this matter is remanded to the District's CSE with instructions to develop an IEP for Frank which will address his particular needs, consistent with this decision. The District shall make a concerted effort to ensure that Frank attend classes with students who have similar learning disabilities and intellectual abilities, and in which the subject matter is presented from a multi-sensory, sequential approach. Pending the development of such an IEP, Frank shall remain in his current educational placement. The parties shall settle a judgment, including appropriate injunctive relief, on or before June 30 on 10 days notice.

■ Evans is not entitled to relief on her claim under 42 U.S.C. § 1983. While such a claim is not precluded because it is brought simultaneously with a claim under the IDEA, in order to obtain relief under § 1983, a plaintiff must establish that a constitutional

---

5. Frank's poor record of attendance and timeliness appeared to play a significant role in the decision of the hearing officer. Frank was absent 29 days (10 of which were unexcused) and late 44 days (all of which were unexcused) during his seventh grade year. Although the problem with tardiness appears to have been solved by his taking a bus to school when he attended Kildonan, his poor attendance appears to have continued. Although, in light of all the evidence, this Court cannot reasonably conclude that Frank's absences were the cause of his inability to learn in the program proposed by the District, as even Smith, the District's own witness, testified that it became apparent that "it wasn't his lack of attendance" that caused him to be unable to pick up on material introduced to him in class,

it nevertheless considers Frank's poor attendance record to be a very serious matter. Almost every teacher that Frank had at Buckeley and Kildonan have commented in various reports that his absences have affected his performance. Like the hearing officer, this Court believes that "[t]his child needs every advantage possible to help him succeed and ... need [not] be caught in this dilemma." That it would do little good for Congress to spend millions of dollars in providing access to a public education only to have it squandered at the whim of a parent who takes a child on vacation while school is in session is a natural corollary to *Rowley*'s caveat that the IDEA contemplates meaningful access to a public education. *Rowley,* 458 U.S. at 200–01, 102 S.Ct. at 3047–48.

violation outside the scope of the IDEA has occurred. *See Bonar v. Ambach,* 771 F.2d 14, 18 (2d Cir.1985). Such a violation has not been established.

SO ORDERED.